WALKER MANUFACTURING COMPANY, a division of Tenneco, Inc., Plaintiff,

v.

HENKEL CONSTRUCTION COMPANY et al., Defendants.

HENKEL CONSTRUCTION COMPANY, Cross-Claimant,

v.

MID–WEST ROOFING CO., Inc. and Philip Carey Company, Cross-Defendants.

MID–WEST ROOFING CO., Inc., Cross-Claimant,

v.

HENKEL CONSTRUCTION COMPANY, Cross-Defendant.

Civ. No. 70–C–2036–C.

United States District Court, N. D. Iowa, Central Division.

May 1, 1972.

Victor M. Harding, Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., and Eugene G. Sarno, Lake Mills, Iowa, for Walker Manufacturing Co.

C. Frederick Beck, Mason City, Iowa, for Henkel Construction Co.

Walter C. Schroeder, Mason City, Iowa, and R. Michael Sweesy, Mason City, Iowa, for Mid-West Roofing Co., Inc.

Robert S. Kinsey, Mason City, Iowa, for Philip Carey Co.

C. Frederick Beck, Mason City, Iowa, for American Insurance Co.

## MEMORANDUM AND ORDER

HANSON, Chief Judge.

Walker Manufacturing Company brings this action against Henkel Construction Company, Mid-West Roofing Co., Inc., Philip Carey Company and American Insurance Company to recover damages it allegedly sustained because of claimed defects in a roof on its De-Luxe Products Plant at Lake Mills, Iowa. Walker contends that it did not get the roof on its building for which it contracted, that in this respect Henkel has breached its contract with Walker, and that Mid-West, the roofing sub-contractor, has also breached its contract and has responsibility to Walker. Walker further claims in a second count against Mid-West on the Mid-West roofing guaranty. Henkel has acknowledged that there have been splits and apparent defects in the roof involved, puts the causes of the same in issue, and further contends in its cross-claim that if it is found liable to Walker by virtue thereof, Mid-West is liable over to Henkel for any such damages and for costs to Henkel of its defense against Walker's claim and the establishment of its cross-claim. Mid-West has denied liability to Walker and in a cross-claim against Henkel has taken the position that in the event Walker recovers against it, it should have a judgment over against Henkel, urging that any defects in the roof were caused

by settlement of the building or by faulty design thereof which it attributes to Henkel. Trial was held to the Court in the matter on October 14, 1971.

## FINDINGS OF FACT

1. Walker, a division of Tenneco, Inc., is a Delaware corporation with its principal place of business in Texas; defendants Henkel and Mid-West are Iowa corporations with their principal places of business in Iowa; defendant Philip Carey is an Ohio corporation with its principal place of business in Ohio; and, defendant American is a New Jersey corporation with its principal place of business in New Jersey. The amount in controversy in this cause exceeds $10,-000 exclusive of interest and costs.

2. Walker for more than ten years past has owned and operated a manufacturing plant in Lake Mills, Iowa, where it has engaged in manufacturing filters and other automobile components for the automotive industry. In late 1968, Walker carried through with plans for the construction of an addition to its plant in Lake Mills, which is also known as the DeLuxe Products plant. The basic or outline specifications for the DeLuxe Products addition were prepared by Walker engineers and architects located in Walker's main office in Racine, Wisconsin. In December of 1968, Walker tendered its invitation for bids for the detailed engineering and construction of the DeLuxe Products addition to various general contractors, among whom was the defendant Henkel.

3. Henkel submitted a bid to perform the work for a total price of $618,431. This bid was accepted by Walker, and on February 14, 1969, Walker and Henkel entered into a written construction agreement. Defendant American underwrote Henkel's performance of this construction agreement by bond dated February 14, 1969. By the express terms of the construction agreement the DeLuxe Products addition was to be constructed in conformity with the outline specifications prepared by Walker's engineers, which specifications were contained in the construction agreement. Contained in the outline specifications were these specifications pertaining to the roof of the addition:

*Roof and Roofing*:

Provide a metal deck and 1″ minimum rigid insulation applied with Lexsuco or equal adhesive to afford a Class I roof. Roofing shall be applied in accordance with manufacturer's specifications for a 20-year bonded built-up roof. Provide all flashings and gravel stops in connection with the roofing and where required to make building water and weather tight.

Owner must approve eave details.

Provide 5′ canopy over truck loading doors.

Provide 3′ roof overhang around guard house.

Roof anchorage shall be designed to resist uplift wind pressures recommended by F.I.A.

Provide an expansion joint across the width of the roof.

4. After the execution of the contract between plaintiff and Henkel, and in accordance with the contract, Henkel proceeded to engineer the plant addition to be constructed. Included in the design produced by Henkel was the design of all structural supports and members for the building such as the roof framing plan, structural framing plan, and joists and deck layout. The design also specified and included the use of Wheeling steel deck, Type F, 22 guage.

5. On or about January 12, 1969, Henkel requested in writing bids from various roofing contractors, among whom was defendant Mid-West. Mid-West prepared and submitted a proposed bid on January 17, 1969, for the construction of the built-up roof on the DeLuxe Products addition. After consulting with its fire insurance carrier, Walker requested that the roofing specifications be amended to comply with what was referred to as F.I.A. Construction No. 2. This has reference to Underwriters' Laboratories, Inc. Building Ma-

terials List, Metal Deck Assemblies, Construction No. 2, which specifies, among other things, a steel deck of No. 22 guage or heavier, on which should be spread steep asphalt at the rate of 12 to 15 pounds per 100 square feet, in ten-inch wide strips, spaced not closer than 12 inches on center, and insulation made by certain specified manufacturers. In other words, there was to be at least a two-inch wide gap between the ten-inch strips of asphalt between the steel deck and the noncombustible insulation. Henkel and Mid-West agreed to comply with the additional specification; Mid-West indicated to Henkel that there would be no extra charge for compliance therewith.

6. On May 14, 1969, Henkel submitted its purchase order to Mid-West to construct the built-up roof specified in their mutual agreement for a contract price of $43,334, which price did not include a 20-year surety bond. The type of roof which Mid-West agreed to provide under the contract with Henkel was a "20-year type Bitumen, felt and gravel Built-Up roof" to conform with F.I.A. Construction No. 2. The term "20–year type roof" refers to various types of built-up roofs, the specifications of which are prescribed and furnished by the various manufacturers of roofing materials and which, if certain procedures are followed, will result in the particular type of built-up roof being eligible, upon payment of premium, to have a surety bond issue with respect to such built-up roof. The type of 20-year built-up roof which Mid-West agreed to furnish was a Philip Carey No. 401 built-up roof. A Philip Carey built-up roof is a 20-year type roof.

7. The built-up roof which Mid-West was to lay down on top of the steel deck furnished by Henkel was to consist of the following:

a. A ribbon mopping of steep asphalt (the same thing as pitch or bitumen), to act as an adhesive or bond between the insulation and the steel deck.

b. A one-inch thick rigid insulation board, purchased from Johns-Manville

Corp. and called by its brand name "Fesco Board." This insulation is composed of mineral or rock granules, like perlite. It comes in rigid slabs approximately 3' x 5' in dimension. In this case the insulation was laid down perpendicular to the direction of the flutes or ribs of the metal deck.

c. The top surface of the insulation was coated with asphalt or bitumen, to serve as a bond or adhesive between the insulation and the first layer of felts.

d. Over the asphalt-coated insulation are laid two plies of 40-pound, about 3 feet wide, base sheets which are bonded together by a layer of bitumen. These felts are composed of wood fibers, saturated with bitumen, which are further coated with bitumen, and which are laid down with an overlap so that at least two layers of felts cover the entire roof surface.

e. The top surface of the two-ply felts is then covered with a well-mopped spread-coat of asphalt or bitumen, upon which is spread a layer of gravel.

8. The building structure was begun by Henkel about March of 1969. Henkel erected, pursuant to its design, the building structure, floors, walls, and metal deck for the roof. The metal deck was not supported by the walls, but rested on steel joists and beams which in turn were supported by steel columns resting on a concrete floor. Mid-West put on the built-up roof in June and July of 1969, and the building was completed in September of 1969. The building was accepted by Walker, and both Henkel and Mid-West were fully compensated by Walker in accordance with the terms of their respective agreements.

9. Commencing in January of 1970, various splits occurred in the built-up roofing at several different locations in the plant addition. Walker immediately notified Henkel, who in turn notified Mid-West. Walker then engaged the services of C. E. Lund, an engineer and a professor of engineering at the University of Minnesota, who specializes in failures of built-up roofs and their

causes. In February of 1970 Professor Lund visited the DeLuxe Products addition (in company with representatives of Walker, Henkel, and Mid-West), took several samples of the roofing, which he later tested in his laboratory, and made a written report to Walker (copies of which were supplied to Henkel and Mid-West) which contained these features:

a. The cause of the failures and splits in the built-up roofing was primarily because of a lack of adhesion between the insulation board and the metal deck, which in turn was caused primarily by insufficient quantities of asphalt or bitumen in the ribbon mopping. There was also insufficient bitumen or asphalt between the bonded felts and the insulation board, and insufficient bitumen in the flood-coat. He estimated, on the basis of testing his samples, that the total deficiency of asphalt or bitumen, over the entire expanse of the roof, was 19.65 tons of asphalt.

b. Merely patching where the splits occurred would not correct these deficiencies, as the roof would continue to split in new areas to an increasing extent.

c. The only sound solution was to remove all of the existing roofing over the metal deck and lay down a new built-up roof. In this way any injury caused to the steel deck by water leaking through the roofing could be repaired before the new roofing was laid down.

10. Following Professor Lund's report, Mid-West employed Wallace, Holland, Kastler & Schmitz of Mason City and later Professor E. C. Shuman, a roofing expert. It also utilized the facilities of the Mid-West Roofing Contractors Association. On the basis of this information, Emil Koerber of Mid-West, and Paul Morris of the Mid-West Roofing Contractors Association met with Walker representatives. Mid-West offered to make permanent repairs in discharge of its obligation under its guarantee. Mid-West proposed certain limited repairs consisting of the removal of roofing around the splits in a strip four feet wide centered on the splits and the rebuilding of these segments. Walker refused to accept the permanent repairs offered by Mid-West and insisted that it was entitled to a complete replacement of the roofing, as Professor Lund's report indicated.

11. Mid-West temporarily patched the existing splits, wherever they appeared, during the spring months of 1970. Mid-West, however, refused to put on a new roof, claiming that it was not responsible for the failures in the roof. With the arrival of warmer weather, Walker experienced several leaks into the plant interior, and the leaks continued even after Mid-West had patched the existing splits. Mid-West performed patching work into June of 1970, but thereafter refused to perform any further work on the roof unless Walker paid for it.

12. This action was commenced in October of 1970. At the pretrial conference held on February 10, 1971, Walker announced that it could no longer tolerate the leaky roof, and that as soon as the weather permitted, it would take off the old roofing over the metal deck and put down a new roof. Walker further announced that it was suffering considerable damage inside the plant and that there was a grave possibility that some serious disaster or even a loss of business could result from continuing with a leaky roof on its plant. The parties then stipulated, and the Court's pretrial order of February 10, 1971, directed, that "as soon as possible" Mid-West would temporarily patch the splits which had appeared during the winter months, the cost of which would be borne by whatever party was ultimately found responsible for the defective roof. Mid-West failed to take reasonably prompt action to patch the leaks. As a result, over the two days of February 18 and 19, 1971, a severe rainstorm produced a quantity of severe water leaks inside the plant. Walker suffered some substantial

damage to its inventory as a result. While the roof was leaking severely, Walker directed its employees to move its inventory to a safer place and to cover the goods and machinery with plastic sheeting, purchased for the occasion. Because the plastic sheeting rendered the fire sprinkler system ineffective, Walker also hired guards to patrol the area around the clock as a fire prevention precaution. All of this was done by Walker in an effort to mitigate damages caused by the defective roof. After the severe leaks in February of 1971, Mid-West patched the splits in the roofing, but Walker continued to experience leaks up to the time the old roofing was replaced. Mid-West patched these leaks.

13. The splits experienced by Walker in 1970 and 1971 were many and substantial. Some splits were over 100 feet in length, although the great majority were of a lesser length. The splits produced gaping holes in the membrane, exposing the insulation underneath and allowing water to freely enter into the building. The majority of the splits occurred to the western half of the roof, although major splits also occurred to the eastern half.

14. In April of 1971 Walker issued invitations to roofing contractors to bid for the work of removing the existing roof down to the metal deck and for the construction of a new built-up roof over the metal deck. The lowest available bid was made by Harrington Roofing Company. Walker then entered into a contract with Winnebago Constructors, Inc., an affiliate of Henkel, to supervise the work to be performed by Harrington.

15. The old roofing was replaced during July and August of 1971. The new roofing has proved to be satisfactory to Walker.

16. All parties agree that the roof failed. The parties further agree that the major cause—though not necessarily the only directly contributing cause—of the roof failure was a loss of adhesion between the steel deck and the insulation, and thereafter between the insulation and the built-up roofing membrane. As Professor Lund quite lucidly explained in his testimony, a built-up roofing membrane, such as contracted for by Walker, even when laid in a good, workman-like manner, does not necessarily have sufficient strength, in and of itself, to endure the lateral stresses resulting from thermodynamic expansion and contraction under northern Iowa weather conditions. The membrane is weaker across the width of the felts—in layman's terms, tar paper—than in the long direction of the felts, because the strength of the membrane across the width of the felts is dependent to a great degree upon the adhesive effect of the steep asphalt applied between the felt plies, whereas along the length of the felts the felt itself provides the strength. If a roofing membrane the size of that on the De-Luxe Products roof is attached to the building only at the edges—this particular phenomenon is known as a "floating roof"—the membrane itself is forced to withstand all lateral stresses placed upon it because of the thermal factors. Thus, for example, on a calm day in northern Iowa when maximum solar radiation exists and the outside air temperature is 20°F, the roof surface temperature approaches 90°F. During the late afternoon, when solar radiation no longer exists, accompanied by an increase in wind velocity and a sudden drop in outside air temperature, the roof temperature may drop 100°F in a short period of time. This would result in a thermal shock to the roofing membrane because of the rapid internal contraction occurring in the membrane. This often results in tension splits in a floating membrane, the splits occurring at the weakest point in the membrane. Thus, it is essential that a roofing membrane, intended for a roof in northern Iowa, be securely fastened to the metal deck so that the membrane can borrow strength from the building structure, which expands and contracts to a much lesser degree than does the membrane. In a roof such as the instant one, this would mean that the

insulation must be securely fastened to the metal deck by a suitable adhesive, such as steep asphalt. The roofing membrane must, in turn, be securely fastened by steep asphalt to the insulation board. It is also essential that the membrane itself be as strong as possible, so that it can withstand internally, so far as possible, the thermal shocks resulting from Iowa weather. This would mean that the felts must properly be overlapped, that adequate steep asphalt be placed between the layers of felts to firmly hold them together, and that an adequate flood coating of steep asphalt and gravel be placed over the top of the felt plies.

17. The overwhelming weight of evidence in this case indicates that Mid-West did not comply with the above-mentioned requirements for building a roof which would meet contract specifications. The roof Mid-West laid did not have an adequate amount of steep asphalt between the steel deck and the insulation board. On a large portion of the roof, especially in the western half, testimony of observers and photographs show that the ribbon moppings were thinly applied, were much less than 10 inches wide, and were spaced at a much greater distance apart than 2 inches. Furthermore, the ribbon moppings were placed perpendicular to the flutes, or troughs, in the deck, resulting in much of the mopping being placed in the flutes where it could not come in contact with the insulation board. Professor Lund indicated, and the experience in removing the roofing subsequently confirmed, that much of the mopping dried before the insulation board was laid. The best evidence that this occurred is that, when the insulation board was removed, it came up, in most instances, quite easily; most of the steep asphalt remained fixed to the steel deck, while very little asphalt stuck to the bottom of the insulation board.

18. The testimony of Professor Lund and Dwight Jennings, Henkel's expert, further indicated that there was insufficient steep asphalt between the insulation board and the felt plies and between the plies themselves. The flood coating and gravel was also thin in many places. Mr. Jennings also showed to the Court several instances where there was insufficient overlap in the plies of felts laid. Other evidence before the Court confirms these experts. Mid-West, in rebuttal, has placed before the Court its Iowa Sales Tax records, which show that more steep asphalt than required by the contract was used in the job. The Court finds much difficulty in believing that this quantity of asphalt was used, but even if Mid-West's records indicate the true amount of adhesive used, the Court has no trouble in concluding that the adhesive was improperly applied. The Court finds that Mid-West did not lay the roof in good, workman-like manner, that Mid-West did not provide the roof it contracted to provide, and that these failures were the material causes why the roof failed. The Court does not construe the testimony of Mid-West's expert, Professor Shuman, as being contrary to this finding, except to the extent that Professor Shuman indicates that there were additional material causes for the roof's failure. Theo Cree, Mid-West's foreman, in his testimony to the Court, also expressed serious reservations that the roofing was laid in a good, workmanlike manner.

19. In its counterclaim, Mid-West alleges that Henkel breached its contract to Walker by failing to provide an adequate steel deck upon which the roofing could be laid, such breach allegedly being the sole material cause of the roofing failure. Mid-West contends that the steel decking was of a thinner guage than the 22 guage steel specified by Walker. The sole support for this argument is found in the testimony of Professor Schuman. During his only visit to the DeLuxe Products plant in February of 1971, Professor Shuman measured one piece of steel decking which had deflected and broken from its weldings. This piece of decking, measured with a micrometer borrowed from Walker, was determined to be between 23 and 24 guage, thinner

than the required 22 guage. The Court cannot conclude from this isolated sample that the entire steel decking was of a lesser guage than 22 guage. The Court places little weight on this evidence for the further reason that, before trial, the entire roof was stripped down to the steel deck; thus, Mid-West had an opportunity to take a good sampling of the entire deck, but failed to do so. All other evidence in this case supports a conclusion that the decking was indeed of a 22 guage thickness.

20. Mid-West further contends, and presented some evidence in support, that even if the deck was of 22 guage steel, this guage of steel deck, taken in conjunction with the spans between the underlying supporting steel members, was not adequate to support a 20-year type built-up roof. Mid-West blames Henkel for improper design which would cause the deck to flex to such a degree that it would be impossible to achieve a bond between the deck and the insulation using the steep asphalt adhesive specified in the specifications. Mid-West presented the testimony of Gene Guestko, an engineer from Mason City, in support of the proposition that a worker carrying a certain amount of weight, stepping in a certain place, could flex the steel deck as much as $\frac{3}{8}$ of an inch, thus causing the bond to break between the decking and the insulation, and possibly further causing permanent distortion in the steel decking. The evidence in this case, however, does not indicate that such a hypothetical worker actually existed or that the enormous splits in the roofing can be traced to incidents of this nature. The massive weight of the evidence indicates that in many substantial areas of the roof, no bond between the decking and the insulation ever existed, because of the improper application of the steep asphalt; thus, there was no bond for the hypothetical worker to break. The Court is further impressed by the fact that Mid-West knew that the steel deck was flexible at the time it commenced the performance of its obligation. It took some

precautions to partially assure against damage to the deck, but at no time did it complain to Walker or Henkel of the impossibility of performance on the deck. This issue was first raised at the time it asserted its counterclaim. It was not even partially supported until later. The Court deems this contention to be an afterthought, and concludes that any problem pertaining to the adequacy of the steel decking, although it may have contributed in a few small isolated areas to the overall problem of lack of adhesion between the steel deck and the insulation, was not a material cause of the roof's failure. The steel decking and the structural design met the specifications of Walker and are considered acceptable by the industry and all testing associations.

21. At the commencement of the laying of the roofing, Theo Cree, Mid-West's foreman, noticed that the steel deck was light and springy. Mr. Cree testified that this thickness of deck was not usual in his long experience, but that Mid-West had laid roofing successfully on this thickness of decking before. Mr. Cree took extra precautions as the result of his observations, among which were placing a plywood platform where roofing materials were to be landed on the deck and filling tar and gravel spreaders to half-capacity in order to lessen their weights. Mr. Cree further observed that the decking was being damaged in some places by Henkel's activities on the decking. He advised Henkel's foreman, George Meier, of this and requested that Meier repair or replace the damaged decking and broken welds. Mr. Meier ordered Henkel workers to do so to the extent extra pieces of decking were available to Henkel (the decking subcontractor had already left the construction site). Henkel did replace the seriously damaged pieces of decking. Mr. Cree, however, was not satisfied. He, nevertheless, proceeded with laying the roofing, repairing some portions of the decking which were damaged, in his estimation, with loose scraps of decking he found on the steel deck. Mid-West now

contends that the lack of adhesion between the decking and the insulation was caused to a material degree by Henkel's traffic on the roof, which resulted in damaged and distorted steel decking. It offers in further support of this proposition Mr. Cree's testimony that when he stepped on the corners of the insulation boards in some instances the corners would break off, thus indicating that the decking surface was not flat in these places. The court notes that this reason given by Mid-West for the roof's failure was raised by Mid-West only after the roof had apparently failed. Mid-West was at the time of its performance a vastly experienced roofing contractor. Its foreman was also a highly experienced roofer. Mid-West had all the facts pertaining to the condition of the decking before it when it made its decision to proceed with laying the roof. Because it proceeded, the Court concludes that this reason for the roof's failure is an afterthought by Mid-West, and the Court cannot find, therefore, that activity on the steel decking by Henkel was a material cause of the roof's failure.

22. Mid-West also contends that the settling of the supporting structure or of the roof decking subsequent to the laying of the insulation and roofing by Mid-West caused the roofing failure. There is simply no evidence of any such settling. There is some evidence of some low spots on the roof which caused some ponding of water, but the roof was designed to withstand ponding to the extent shown in the evidence. This ponding did not cause any of the splits or other defects in the roof.

23. Mid-West further contends that heavy traffic by Walker people after the building was completed was a material cause of the bond breaking between the insulation and the decking. The Court must here reiterate its finding that the alleged "bond" never in fact existed in many substantial areas of the roof. During the late fall or early winter of 1969 Walker placed some new stacks on the roof. This involved cutting the roof in various places and rolling a few heavy metal stacks across certain portions of the roof. As a result of this operation two or three insubstantial cuts occurred in the membrane which were promptly repaired. Although Walker's activity possibly contributed to the sorry condition of the roof, this activity was not a material cause of the roof's failure, because the evidence shows the roof to have been fatally defective when it was laid.

24. Thus, the Court concludes that the failure of the roof was a direct result of Mid-West's failure to deliver the roof specified in its contract and failure to apply the roof in a good, workmanlike manner. These failures of Mid-West were the sole material cause of the roof's failure. Although other factors possibly aggravated the situation, but for Mid-West's failures, the roof would have been a 20-year built-up roof and would not have failed. The Court must determine, therefore, the damage sustained by Walker as the result of Mid-West's failure to fulfill its contractual obligations.

25. As a result of the deluges of water pouring into the plant because of the leaky roof, Walker has suffered damages to its merchandise stored and kept in the building in the sum of $2,181.00. This damage was a direct result of Mid-West's failure to take reasonably prompt steps to repair the DeLuxe Products roof pursuant to this Court's Order of February 10, 1971. Walker has also suffered damages incident to its efforts to protect its merchandise and its equipment in its building from damage as a result of leaks in the roof caused by Mid-West's failures to fulfill contract obligations, and in its efforts to minimize damages to itself resulting from such failures, in the sum of $1,818.00 for out-of-pocket costs of material purchased to protect against such leaks and $3,998.00 for extra labor required. The $3,998.00 figure is the expense incurred by Walker in employing personnel on an hourly wage basis to move inventory to a safer place, to erect a plastic covering over inventory and machinery so that the plant could carry on operations, and to

hire guards to patrol the plant while the fire protection sprinkler system was rendered ineffective by the plastic sheeting spread inside the plant. The evidence before this Court indicates that the Walker management was faced with two alternatives as a result of the deluge coming down from the roof beginning on February 18, 1971: either to shut down the plant and send all hourly personnel home without pay or to secure the performance of the work mentioned above in order that the plant could continue to operate. It determined that the second alternative was the proper one because damages would be mitigated to a greater extent. The Court finds that this decision was the proper one. Thus, these hourly workers performed work not within the contemplation of Walker's ordinary course of business at the DeLuxe Products plant. The expense incurred as the result of the employment of these hourly workers was reasonable, was necessary to properly mitigate damages, and Walker would not have incurred this expense but for Mid-West's failure to perform its obligations.

26. Walker also claims $2,050.00 damages sustained as the result of work performed by salaried or supervisory personnel to an effort to mitigate damages resulting from the February 18 and 19 deluge. The Court finds that this money would have been expended by Walker even if the leaks had not occurred. Thus, the Court cannot find these expenses reasonably related to Mid-West's failure to perform its contractual obligations.

27. In replacing the old roof in 1971, Walker incurred the following items of cost:

1) $18,300.00 to Harrington Roofing Co. to remove the old roofing.

2) $6,028.00 to Harrington to install a new 20-year type built-up roof.

3) $3,740.00 to Harrington to clip or nail the insulation firmly to the metal deck.

4) $7,000.00 to Winnebago Constructors, Inc. for a management for supervising the laying of the new roofing.

5) $14,265.26 for repair and replacement of damaged and rusted steel decking and for supervision of this operation.

28. Walker claims that $60,028.00 was a sum reasonably expended in securing the roof for which it originally contracted. Two years previously, in 1969 Walker contracted with Mid-West to build a 20-year type built-up roof for $43,334.00. Disregarding the nailing of the new roof, which is a separate expense, the new roof contemplated features not contracted for in the old roof:

1) The roofing membrane was composed of four plies of 15 pound felts instead of two plies of 40 pound felts, to give the membrane additional strength.

2) The joints and edges of the insulation board were taped to prevent individual pieces from moving in different directions and to further stabilize the roof.

3) Two additional expansion joints were placed to decrease the areas of individual parts of the membrane.

4) The insulation board was of fiberglass whereas the original insulation board was Fesco board.

These new features have not been proved by the evidence to be essential for a good 20-year type built-up roof, although the Court agrees that most of these items would aid in assuring that the roof would last for 20 years. Since these items are not essential to a 20-year type built-up roof and since there is insufficient evidence in the record to show that the roof Mid-West proposed to lay was not a 20-year type built-up roof (in fact, most of the evidence in the record is to the contrary), the Court cannot find that these items justify the difference in contract prices between the old and new roofs. There is some evidence in the record indicating that the new roof was laid in such a way that no part of the inside of the building was exposed to the elements overnight. This was done to mitigate possible damages occurring to the contents of the building (the plant

continued manual operations while the new roof was being laid). Furthermore, roofing operations on the new roof were halted on days when there were signs of impending precipitation to assure that no water would get inside the building or be sealed into the roofing itself. The Court finds these precautions to be well taken. There is no concrete evidence before the Court, however, to indicate what portion of the difference between the two contract prices is attributable to these factors. Neither is there evidence to show that the difference in costs was due to increased construction costs. No finder of fact, of course, has license to speculate. Accordingly, from the evidence before it, the Court must conclude that the original contract price, $43,334.-00, was the reasonable cost for Walker to incur in securing the roof for which it originally contracted. The difference between that figure and the $60,028.00 Walker expended was cost incurred by Walker because of its own preferences and its own ideas about a roof which would last for 20 years. This additional cost cannot, from the record, be attributed to Mid-West's failures to perform its contractual obligations.

■ 29. Mid-West has urged to the Court that the permanent repairs it offered to make on the roof in 1970 would have given Walker the roof for which it contracted. The Court finds this not to be the case. Mere permanent patching over the existing splits in the roof would have only anchored down certain isolated portions of the roof. There was much evidence at the time Mid-West tendered its offer that a substantial portion of the roofing membrane was not properly restrained. The permanent patching proposed by Mid-West would have only increased the tension on other portions of the membrane by making more radical the differences in resistance to movement of the various portions of the membrane. In order to secure a good built-up roof it is necessary that the resistance to movement be uniform throughout the area of the membrane; this is the only way to assure that the membrane will not pull apart because of internal tensions. The Court finds that Walker acted properly and prudently in not accepting the permanent patching offered by Mid-West.

30. Henkel submits that Walker acted properly in removing and replacing the western half of the roof, but that the eastern half did not have to be replaced. Rather, Henkel argues, Walker could have salvaged part of the eastern half by careful sampling of various portions of that half. Henkel suggests that should this sampling have shown that part of the roof to be defective, then Walker should have replaced that portion, but Walker should have left intact those portions of the eastern half of the roof which sampling would have disclosed were viable. The Court notes at the outset that this sampling proposed by Henkel would have to have been extensive. It could well have weakened even the good portions of the roof because of the cutting and patching of the membrane involved. There is no evidence that Walker could have actually saved money by using this method. Furthermore, the evidence shows that even though actual splitting of the membrane occurred much more infrequently in the eastern half, there were many leaks coming into the plant interior in the eastern half. This means that water was traveling along the flutes in the decking into the eastern portion. Thus there was a strong probability that much of the insulation board in the eastern half was rotted to some extent by water. But more significantly, this indicated a probability that there was much moisture sealed into the eastern portion of the roofing. Moisture within the roofing is one cause of spliting. Thus, the sampling suggested by Henkel could not have assured against the moisture problem. Henkel's expert indicated on the stand that he could not assure against subsequent difficulties even if Henkel's plan were adopted. The Court, therefore, concludes that Walker

acted properly in removing and replacing the entire roofing down to the steel decking.

31. The Court further finds that the $3,740.00 cost incurred for nailing down the insulation and the $7,000.00 expended for management fees were not expenses for items necessary to secure the roof for which Walker originally contracted. Nailing to the deck is not within any manufacturer's specification for a 20-year bondable roof, upon which a 20-year bond can be issued. Walker's own engineering personnel were at all times present when the new roof was laid, as were supervisory personnel from Harrington. The additional management people hired by Walker were not a reasonable expense toward securing the roof for which Walker originally contracted.

32. With respect to the $14,265.26 incurred by Walker for repair and replacement of the damaged and rusted steel deck, the Court simply does not find sufficient specific evidence in the record to support any finding of fact as to the reasonableness of this expense. The Court, moreover, can discover no evidence in the record indicating how much, if any, of the work can be attributed to damage caused by Mid-West's failure to perform its contract obligations. In order to find for which Mid-West was responsible here, the Court would have to speculate. This the Court cannot do.

33. In its efforts to ascertain the causes of the roof splits and breaks and in its efforts to minimize its damages, Walker expended $1,249.00 for fees and expenses of Professor Lund. The Court finds that these expenses were reasonable and necessary and were incurred by Walker as a result of Mid-West's failures to perform its contractual obligations.

34. Walker also claims costs incurred with respect to three salaried employees. These three individuals were regularly employed in performing engineering, architectural and other similar technical work for Walker. Walker claims that these employees, in connection with efforts to find the cause of the roof failures, conferred with general and roofing contractors over measures to be taken to correct the problem. They further investigated various kinds of built-up roofs, the components of such roofs, and the proper roofing practices to assure a 20-year type roof. They also served as owner's representatives at the installation of the new roof. Walker claims that these three employees devoted a total of approximately 700 hours in undertaking these tasks, that the total expense incurred by Walker was $14,169.30, and that Walker would have had to pay that amount to obtain similar services. There was no sufficient indication at trial as to what these employees would have been doing had they not been working on the roof problem. Thus, $10,539.00 of this expense, the amount Walker attributes to the time its employees spent working on this project has not been shown as an expense solely attributable to Mid-West's failures to perform its contractual obligations. $3,630.30 was expended by Walker, however, for the purpose of transporting and maintaining these personnel at stations of duty other than their ordinary stations and for other similar purposes. These expenses were reasonable and were incurred by Walker solely because of Mid-West's failures to properly perform.

35. The evidence in this cause shows that Philip Carey did not, in any way, cause the roof failure.

36. There is no evidence in the record showing what, if any, damage Henkel sustained as the result of Mid-West's failures to perform its contract.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this cause of action by reason of the diversity of citizenship of the parties hereto and the amount involved herein. 28 U.S.C., Section 1332.

2. A contract existed between Mid-West and Henkel in accordance with

which Mid-West agreed to place a roof on the DeLuxe Products plant at Lake Mills, Iowa, conforming to the specifications of Walker stated in its contract with Henkel. Mid-West breached its contract with Henkel by failing to lay the roof specified in the contract.

3. As a result thereof and for no other reason, Henkel breached its contract with Walker, thus causing Henkel to be liable for damages to Walker. American is liable to Walker for the same amount by reason of its performance bond.

4. Mid-West, because of its breach of its contract with Henkel, is liable to Henkel and American for damages they sustained as a result of their liability to Walker.

5. The measure of Walker's damages is the amount which is required to compensate Walker for all unavoidable harm that Mid-West had reason to foresee when the contract was made. These damages are compensatory in nature; they are limited to the loss Walker actually suffered by reason of the breach and it should not be placed in a better position than it would be in if Mid-West had fulfilled its contractual obligation. These compensatory damages are to be the cost of construction and completion of the building in accordance with the contract, if this is possible and does not involve unreasonable economic waste. Hansen v. Andersen, 246 Iowa 1310, 71 N.W.2d 921 (1955); Trunk & Gordon v. Clark, 163 Iowa 620, 145 N.W. 277 (1914); Restatement of Contracts, Section 346(1) (a). If the construction and completion in accordance with the contract would involve unreasonable economic waste, then the measure of damages is the difference between the value the building constructed would have had and the value of the performance that has been received by Walker. *Id.* Here, Walker paid Mid-West, through Henkel, $43,334.00 for a worthless roof. This rendered the entire DeLuxe Products addition, constructed at a cost of $618,431, worthless for the purposes for which it was intended. It was not unreasonable for Walker, after giving Mid-West an opportunity to replace the roof, to proceed to reconstruct the roof itself, by securing another contract. The portion of the initial cost of the building attributable to the roofing was only approximately 7% of the total cost of the building. It would have been a totally unreasonable economic waste for Walker to have done anything but to have reconstructed the roof, for its only other alternative was to abandon the building. This instant situation is not similar to the situation in Hansen v. Anderson, *supra,* where the Supreme Court of Iowa held that it would be economically unreasonable to reconstruct a defectively built building where (1) the building was operational, (2) the owner had made no effort for a substantial period of time prior to trial to secure reconstruction, and (3) the cost of reconstruction would be a substantial percentage of the original contract price. This instant case is closer to Trunk & Gordon v. Clark, *supra,* where the court held that the cost of reconstruction would be the proper measure of damage where the reconstruction involved an insubstantial percentage of the total cost of the building and where the defects in the building materially decreased the usefulness of the building for the purposes for which it was intended. Under this rationale, then, the Court concludes that Walker should be awarded $61,634.00 to compensate it for removal and replacement of the defective roof.

6. The Supreme Court of Iowa has approved the rule stated in Hadley v. Baxendale, 9 Exch. 391, 156 Eng.Rep. 145 (1854). This rule states that an injured party is entitled to "such damages as may fairly and reasonably be considered as arising naturally—that is, according to the usual course of things—from the breach, or such as may reasonably be supposed to have been in the

contemplation of both parties at the time they made the contract, as the probable result of the breach." DeWaay v. Muhr, 160 N.W.2d 454, 459 (Iowa 1968). These damages are generally categorized as "consequential damages." The Court concludes that Walker is entitled to reasonably foreseeable consequential damage in the sum of $12,876.30.

7. Henkel is entitled to no damages from Mid-West other than those damages it suffers as a result of its liability to Walker, those damages being $74,510.30.

8. Philip Carey is not liable to any party named in this cause of action.

In conclusion, therefore, the Court finds that judgment should be entered in favor of Walker Manufacturing Company against Henkel Construction Company and American Insurance Company in the amount of $74,510.30, together with interest from date of judgment. The Court further finds with respect to Henkel's and American's cross-claims against Mid-West, that judgment should be entered in favor of Henkel Construction Company and American Insurance Company against Mid-West Roofing Co., Inc. in the amount of $74,510.30, together with interest from date of judgment.

Judgment shall be entered dismissing all claims in this lawsuit against Philip Carey Company. Judgment shall be entered in favor of Henkel Construction Company and against Mid-West Roofing Co., Inc. on Mid-West's cross-claim and it shall be dismissed. Mid-West Roofing Co., Inc. shall bear the expenses it incurred in repairing Walker's roof pursuant to this Court's Pretrial Order of February 10, 1971. All costs of this action shall be taxed to Mid-West Roofing Co., Inc.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and order for judgment in this case in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.