FILED
United States Court of Appeals
Tenth Circuit

November 25, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

CHARLES D. LEONE, II,

      Plaintiff-Appellant,

v.

STEVEN C. OWSLEY; DREW M. HAYWORTH,

      Defendants-Appellees.

No. 14-1185

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:12-CV-02961-PAB-KMT)**

---

Sean Connelly (Tess Hand-Bender with him on the briefs) of Reilly Pozner LLP, Denver, Colorado, for Plaintiff-Appellant.

Shannon Wells Stevenson (Brett C. Painter and Nathalie A. Bleuzé with her on the brief) of Davis Graham & Stubbs LLP, Denver, Colorado, for Defendants-Appellees.

---

Before **MATHESON**, **SEYMOUR**, and **McHUGH**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

In 2012, appellant Charles D. Leone II resigned his position as a principal of Madison Street Partners, LLC ("MSP"). Pursuant to the terms of MSP's Operating Agreement, fellow principals Steven Owsley and Drew Hayworth elected to buy Leone's interest in MSP. The agreement required the purchase price to be set at fair market value, as determined in good faith by MSP's managers, Mr. Owsley and Mr. Hayworth ("Managers"). After receiving valuations from two independent valuation firms, the Managers proposed a purchase price of $135,850, which Mr. Leone rejected.

Mr. Leone sued the Managers in federal district court, contending the proposed purchase price was far below market value and asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The Managers moved for summary judgment on both claims, arguing Mr. Leone's claims were barred by their good faith reliance upon the value set by the independent valuation firms. The district court granted the motion.

On appeal, Mr. Leone contends (1) the district court misapplied the law regarding express and implied good faith obligations, (2) the court also held, incorrectly, that bad faith requires a tortious state of mind, and (3) he presented sufficient evidence of bad faith to survive summary judgment. We conclude the district court erred in granting summary judgment. Accordingly we REVERSE and REMAND for further proceedings.

# I

MSP, a Delaware limited liability company with its principal place of business in Denver, is a registered investment advisor that manages hedge funds. MSP is compensated for this service in two manners: First, it charges fixed fees on the "Assets Under Management" or "AUM." Aplt. App. at 448. Second, it earns incentive fees based on the performance of those assets. *Id.*[1]

At all times relevant to this dispute, MSP was governed by an Operating Agreement. The original members of MSP were Mssrs. Leone, Owsley, Hayworth, Christopher J. Rule, John Elway, and an LLC. Mssrs. Leone, Owsley, Hayworth and Rule were principals and Mssrs. Owsley and Hayworth were the firm Managers. Mr. Leone held a 19.75% interest in MSP. Pursuant to its terms, the Operating Agreement is governed by Delaware law.

When a member's status as a principal terminates, the Operating Agreement gives MSP the right, but not the obligation, to acquire the member's interest in whole or in part. If MSP opts not to purchase the interest, the other members may elect to do so at a repurchase price "equal to the amount that the owner of the [interest] would receive if the assets of [MSP] were sold for their fair market value, *as determined in good faith by the Managers* . . . and the proceeds of the

---

[1]Mr. Leone has not challenged the district court's recitation of facts in its order granting summary judgment. Accordingly, we rely primarily on that order in summarizing the facts of this case.

sale were distributed to the Members." *Id.* at 537 (emphasis added) (citing Art. 10, Sec. 10.2(d) of the Operating Agreement). The Operating Agreement does not further define the process for valuing a member's interest.

Troubled by alleged mismanagement of MSP, Mr. Leone tendered his resignation on August 2, 2012. Mr. Owsley and Mr. Hayworth, acting in their capacity as Managers, elected not to exercise MSP's option to repurchase Mr. Leone's interest. Instead, they exercised their option as members to repurchase the interest. Under the Operating Agreement, they were responsible as Managers for determining the repurchase price.

The Managers hired two independent valuation firms: St. Charles Capital, LLC ("St. Charles") and INTRINSIC (collectively "the Valuation Firms"), having had no previous relationship with either firm. The Managers provided all documents and information the firms requested. Mr. Leone does not contend the firms were unqualified to value a company such as MSP.

In 2009, Duff & Phelps had performed a valuation of MSP, but that valuation was not intended for use in determining the fair market value of a member's interest. The Duff & Phelps report valued MSP at between $50-$65 million. The Managers were reluctant to give the Duff & Phelps report to the Valuation Firms and, after they did, argued that the report was not relevant. The Valuation Firms were aware of the Duff & Phelps report at the time they conducted their analysis.

The Managers told the Valuation Firms that a partner was leaving MSP, the situation was not amicable, there was a high probability of conflict or dispute, and the report was intended to serve as a tool in the context of a negotiation. They portrayed MSP as financially struggling. Although MSP had been in business for about eight years and had no debt, its AUM had declined from $405 million in September 2008 to $150 million in 2012. The Managers told St. Charles one reason the AUM had declined was that Mr. Leone took business from MSP when he left. A reasonable jury could infer this statement was untrue. While Mr. Leone and his parents had withdrawn their money from MSP funds, an amount totaling almost $1 million, Mr. Leone did not take clients with him when he left MSP. Mr. Owsley told INTRINSIC that Mr. Leone's departure from the firm had been an "adverse development" because he was "pretty involved in the day-to-day operations" and it was "just another negative signal to the market that things weren't going right." *Id.* at 456.

The Managers told the Valuation Firms to consider the poor performance of other small hedge funds in the current market. They did not tell the Valuation Firms that MSP sent monthly newsletters to its clients, nor did they provide copies of the newsletters to the firms. MSP's July 2012 newsletter, sent just prior to the valuation, contained detailed information about the performance of its investment funds and stated MSP's portfolio had posted a net gain of 2.65% since the start of the month. It also stated MSP anticipated a "very choppy and volatile

-5-

investment climate for the balance of the year," but it did not indicate that MSP was "struggling." *Id.*

St. Charles' valuation report was based on the information MSP provided, publicly available information, and its expert assessment of MSP's likely future performance. The report assumed total revenue for 2011 of $5.892 million and total net income of $2.21 million. In contrast, MSP's internal profit and loss statement listed total revenue of $7.289 million and a net income of $3.398 million.

INTRINSIC was instructed to perform a calculation report, a rougher financial assessment which did not provide an opinion of the value of MSP. INTRINSIC's first draft of the calculation report was based on a 10-year time frame. After reviewing the draft, Mr. Owsley told INTRINSIC he was not certain MSP would be around for more than two years and instructed the firm to use a two-year time frame. Mr. Owsley also told INTRINSIC to take into account only incentive fees and to disregard management fees. Additionally, INTRINSIC provided the Managers an electronic spreadsheet that allowed them to plug in different numbers for relevant variables to demonstrate how changing the variables would alter the calculated value of the company.

The Valuation Firms reached similar conclusions: St. Charles valued Mr. Leone's interest in MSP as of August 10, 2012, in the range of $126,400 to $158,000; INTRINSIC valued it in the range of $109,000 to $150,000. The

-6-

Managers set the repurchase price at $135,850, the average of the midpoints of the two ranges.

In the fall of 2012, Mr. Leone's expert witness, Mitchell Hoffman, performed an initial calculation valuing Mr. Leone's interest in MSP as of August 2012 at $1.5 million. Later, after reviewing MSP's financials, he prepared a report concluding Mr. Leone's interest was worth $2.1 million. Robert Shields, a professional securities trader who had previously worked with Mr. Hayworth, testified in his deposition that, "based on his knowledge of MSP's 'returns since they opened,' assets under management, and the growth of the company, he believes the buyout price offered to Mr. Leone is 'just extremely low' and 'not even a realistic ballpark.'" *Id.* at 458.

On September 11, 2012, shortly after telling the Valuation Firms he did not believe MSP was doing very well, Mr. Hayworth sent an email telling his father: "I wish I could buy the stake because for once in a long time the firm is on stable grounds." *Id.* at 458-59. Insider Monkey, an investment publication, subsequently "published an analysis indicating MSP was in the top 50 out of 400 hedge funds for value-weighted returns in the second and third quarters of 2012." *Id.* at 459. On June 27, 2013, Mr. Leone sent a letter to Mr. Owsley stating he was part of a consortium willing to pay $1 million to purchase Mr. Owsley's 50.875% interest in MSP. Mr. Owsley did not respond to the offer. A performance review released by Hedge Weekly declared that as of October 2013,

MSP's investment funds were up 19.18% for the year.

## II

In November 2012 Mr. Leone sued the Managers in the District Court of Colorado, claiming (1) they breached Article 10, Section 10.2(d) of the Operating Agreement by failing to act in good faith in valuing his interest in MSP, and (2) they breached the implied covenant of good faith and fair dealing by unreasonably attempting to force him to sell his interest for a price far below fair market value and by refusing to produce MSP tax returns and other financial records for the years 2007 through 2012.

In their Answer, the Managers asserted as an affirmative defense that Mr. Leone's claims were barred by their "good faith reliance on advice of one or more third parties." *Id.* at 28, Answer, ¶ 3. On summary judgment, they argued they were immune from liability under Del. Code Ann. tit. 6, § 18-406, which protects LLC managers who rely in good faith upon expert reports and opinions. Mr. Leone countered that the Managers were *not* shielded by the Delaware statute because they relied on valuation figures that were clearly wrong and improperly influenced the Valuation Firms in an effort to obtain more favorable numbers.

The district court granted the Managers' motion for summary judgment. As to Mr. Leone's first challenge to the immunity defense, it held the Valuation Firms were undisputedly qualified to provide expert reports and there was no

evidence the Managers blindly relied on those reports. With respect to Mr. Leone's second challenge to the immunity defense, the district court concluded he had failed to raise a genuine dispute of material fact as to the procedural integrity of the valuation. The court also rejected Mr. Leone's argument that the Managers acted in bad faith when they refused to turn over MSP's financial records.

**III**

We review de novo the district court's grant of summary judgment to determine whether any disputed material facts exist and, if not, whether the Managers were entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Mid-Continent Cas. Co. v. True Oil Co.*, 767 F.3d 1000, 1004 (10th Cir. 2014). At summary judgment, the moving party carries the initial burden of demonstrating a lack of genuine issue of material fact, which it may satisfy by showing "an absence of evidence to support the nonmoving party's case." *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013). Thereafter, the burden shifts to the nonmoving party "to set forth specific facts showing that there is a genuine issue for trial." *Id.*

We view facts in the light most favorable to the non-moving party and "draw all reasonable inferences in [his] favor." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact

is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (citation omitted).

The Managers moved for summary judgment based on their safe-harbor affirmative defense for which they carry the burden at trial. "Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Significantly for the instant case, "*where the moving party has the burden* [of proof]–the plaintiff on a claim for relief or the defendant on an affirmative defense–*his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party*." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting Schwartzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984) (emphasis in original). *See also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor.") (emphasis in original); *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 530 (11th Cir. 2013) ("When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with

credible evidence that would entitle it to a directed verdict if not controverted at trial.") (emphasis in original) (quotation marks and citation omitted); *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009) ("As to those elements on which it bears the burden of proof, a [movant] is only entitled to summary judgment if the proffered evidence is such that a rational factfinder could only find for the [movant]." (citation omitted)); *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35-36 (1st Cir. 1988) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive." (citing *Calderone*, 799 F.2d at 258)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." 11 *Moore's Federal Practice*, § 56.40[1][c] (Matthew Bender 3d Ed. 2015).

## IV

Mr. Leone contends the district court erred as a matter of Delaware law by (1) conflating express and implied contractual obligations of good faith, (2) holding that bad faith requires a tortious state of mind, and (3) "refusing to consider the substantive unreasonableness of the paltry price for buying out an interest that had generated $2.6 million profits in just the prior four years." Opening Br. of Aplt. at 12. He argues further that even if the district court's

interpretation of Delaware law was correct, it erred in granting summary judgment because he presented evidence sufficient to create a genuine issue of fact about whether the Managers acted in bad faith.[2]

## A. Whether the District Court Correctly Interpreted Delaware Law

### 1. Treatment of the Express and Implied Good Faith Covenants

Mr. Leone asserted two causes of action: breach of the Operating Agreement's express requirement that the valuation of his interest be performed in good faith, and breach of an implied covenant of good faith. The Managers invoked as an affirmative defense Delaware's safe harbor statute, Del. Code Ann. tit. 6, § 18-406, claiming they were immune from liability because they relied in good faith upon the valuation reports of St. Charles and INTRINSIC. Mr. Leone contended the Managers were not protected by that statute because they acted in bad faith by relying on valuation figures that were clearly wrong and by improperly influencing the Valuation Firms in order to obtain a more favorable number.

In granting summary judgment, the district court did not distinguish between Mr. Leone's claim for breach of the express covenant of good faith and his claim for breach of the implied covenant of good faith. Mr. Leone contends

---

[2]Mr. Leone did not appeal the district court's grant of summary judgment against him on his claim that the Managers breached the implied duty of good faith by refusing to provide MSP's financial documents to him.

this was a reversible error because the temporal focus of the covenants differs. He relies principally on *Gerber v. Enterprise Products Holdings, LLC*, 67 A.3d 400 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013), in support of this argument.

In *Gerber*, the plaintiff, who owned limited partnership units, brought a class action against the limited partnership and its directors challenging sale of a portion of the partnership and its subsequent merger into a wholly-owned subsidiary of the purchaser. The limited partnership agreement ("LPA") provided that as long as the general partners relied on an expert opinion in making such a decision, good faith would be conclusively presumed. *Id.* at 410-11. In contrast, the implied covenant of good faith asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.* at 418 (quoting *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440-42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013)). The Delaware Supreme Court, observing that "the LPA's contractual fiduciary duty describes a concept of 'good faith' very different from the good faith concept addressed by the implied covenant," *id.* at 418, held the express provision did not bar a separate claim under the implied covenant of good faith. *Id.* at 419-20. To hold otherwise, the court reasoned, would lead to nonsensical results, particularly in cases "where the general partner's actions in obtaining a fairness

-13-

opinion from a qualified financial advisor themselves would be arbitrary or unreasonable, and thereby frustrat[e] the fruits of the bargain that the asserting party reasonably expected." *Id.* at 420 (quotation marks and citation omitted). The court described hypothetical examples of such conduct, including a qualified financial advisor opining that a transaction was fair even though, unknown to the advisor, "the controller had intentionally concealed material information that, if disclosed, would require the advisor to opine that the transaction price was in fact not fair." *Id.* at 420.

The Operating Agreement in this case required the Managers to set the fair market value of MSP "in good faith," but it neither defined the term nor established conditions under which good faith would be conclusively presumed. This case is therefore more like *DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chicago*, 75 A.3d 101, 107 (Del. 2013), where the LPA had an undefined good faith requirement.[3] There the LPA permitted removal of the general partners if the limited partners "*in good faith* determine that such removal is necessary for the *best interests* of the partnership." *Id.* (emphasis in original). The court defined contractual good faith as follows:

---

[3]*DV Realty Advisors LLC*, is part of a series of Delaware Supreme Court cases interpreting the various nuanced "good faith" clauses in LPAs, of which *Gerber* was one. The other cases are *SIGA Techs., Inc. v. Permathene, Inc.*, 67 A.3d 330 (Del. 2013); *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354 (Del. 2013); *Brinckerhoff v. Enbridge Energy Co., Inc.*, 67 A.3d 369 (Del. 2013); and *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93 (Del. 2013).

-14-

> In our recent opinion in *Brinckerhoff v. Enbridge Energy Company, Inc.*, we defined the characteristic of good faith by its opposite characteristic—bad faith. We applied a traditional common law definition of the business judgment rule to define a limited partnership agreement's good faith requirement. We used the formula describing conduct that falls outside business judgment protection, namely, an action "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." That definition of good faith, as set forth in *Brinckerhoff*, is appropriately applied in this case as well.

*Id.* at 110.

Although the district court here did not differentiate between the express and implied covenants, inquiry into the temporal focus of each would appear to yield similar conclusions in the present case. Focusing on the implied covenant, at the time the parties entered into the Operating Agreement they clearly would have expected a "good faith" valuation of their ownership interests would require the Managers to refrain from taking action that would result in an unreasonably low figure. Focusing on the express contractual provision, one would expect the same fidelity at the time of the valuation.

Nor does the statutory safe harbor provision affect the "good faith" analysis. The statute provides that managers of limited liability companies

> shall be fully protected in relying in good faith . . . upon information, opinions, reports or statements presented . . . by any . . other person as to matters the . . . manager . . . reasonably believes are within such other person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the limited liability company.

-15-

Del. Code Ann. tit. 6, § 18-406. This language is substantially similar to section 14(c) of the Delaware General Corporation Law which the Delaware Supreme Court interpreted in *Brehm v. Eisner*, 746 A.2d 244, 261 & n.51 (Del. 2000), as providing a rebuttable presumption of good faith where the decision maker relies on an outside expert.

### 2. Definition of Bad Faith

Mr. Leone argues the district court erroneously held that bad faith requires "a party's tortious state of mind" such as "moral obliquity, a furtive design or ill will." *See* Aplt. Opening Br. at 14. The court did, in fact, state: "'Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.'" Aplt. App. at 463 (citing *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 346 (Del. 2013)). The district court's description of "bad faith" was more expansive than this, however. Citing the Restatement (Second) of Contracts § 205(d), the court stated: "Bad faith may be characterized by 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, [o]r abuse of power to specify terms.'" Aplt. App. at 463. And it acknowledged aggrieved plaintiffs can defeat the rebuttable presumption of good faith in the statutory safe harbor provision by showing:

(a) the directors did not in fact rely on the expert; (b) their reliance was not in good faith; (c) they did not reasonably believe that the expert's advice was within the expert's professional competence; (d) the expert was not selected with reasonable care by or on behalf of the corporation, and the faulty selection process was attributable to the directors; (e) the subject matter . . . that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice; or (f) [] the decision of the Board was so unconscionable as to constitute waste or fraud.

Aplt. App. at 463-64 (citing *Brehm*, 746 A.2d at 262). Not only does this list include conduct that does not necessarily require "moral obliquity," "furtive design," or "ill will," it also appears to adopt the same temporal focus as the contractual good faith obligation.

Moreover, the district court concluded that in situations where the parties have contractually agreed to be bound by an appraiser's judgment, a party can successfully challenge the appraisal by showing

the appraised market value resulted from a concerted course of bad faith action between the appraiser and the other party–i.e., a breach of contract by a party–*or that the appraiser's result was otherwise tainted by the contractually improper conduct of the other party (such as intentionally providing the appraiser with false information to taint the valuation).*

*Id.* at 464 (citing *Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *3 (Del. Ch. May 13, 2013) (unpublished) (emphasis added)). And the district court acknowledged a litany of contested facts which support Mr. Leone's contention that the Managers (1) took action to influence the valuations of his interest and (2) did not actually believe the valuations reflected

-17-

the fair market value of his interest.

Accordingly, we conclude the district court properly articulated the requirements under Delaware law for a finding of "bad faith" on the part of the Managers.

### 3. *Consideration of Substantive Accuracy of Repurchase Price*

As noted, Mr. Leone contended Delaware's safe harbor provision does not immunize the Managers because they acted in bad faith by relying on valuation figures that were clearly erroneous and by wrongfully influencing the Valuation Firms in order to obtain a lower valuation. The district court declined to consider the reasonableness of the proposed repurchase price, ruling that unless Mr. Leone could show "a concerted course of action between the appraiser and the other party" or "that the appraiser's result was otherwise tainted by the contractually improper conduct of the other party (such as intentionally providing the appraiser with false information to taint the valuation), the parties are stuck with what they bargained for." Aplt. App. at 464-65 (quoting *Senior Hous.*, 2013 WL 1955012, at *3). As discussed in detail in section B below, the district court concluded that it "should be guided by *Senior Housing* [] and refrain from considering the substantive accuracy of the experts' conclusions absent evidence of procedural wrongdoing," *id.* at 469, and then held that no reasonable juror could believe the Managers did anything that affected the procedural integrity of the valuations.

Citing *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93 (Del. 2013), Mr. Leone asserts that the valuation results were so egregiously unreasonable the court should have considered them as an indicator of bad faith. In *Allen*, the parties' LPA imposed a duty on the general partner to make decisions concerning the partnership in "good faith," which the LPA defined as a "belie[f] that the determination or other action is in the best interests of the Partnership." *Id.* at 101. The plaintiff, a limited partner, filed a class action suit in the Court of Chancery against the general partner, its controller, and its board of directors challenging the merger of the limited partnership with the general partner's controller. *Id.* at 95. The Managers filed a motion to dismiss, which the Vice Chancellor granted. *Id.* On appeal, the Delaware Supreme Court affirmed the lower court's dismissal of the complaint on the ground that it failed to state a claim for breach of the LPA's contractual duty of good faith. *Id.* In discussing the requisites of plaintiff's claim, the court held that "the ultimate inquiry must focus on the subjective belief of the specific directors accused of wrongful conduct," but it acknowledged "[s]ome actions may objectively be so egregiously unreasonable, however, that they 'seem [] essentially inexplicable on any ground other than [subjective] bad faith.'" *Id.* at 107 (second and third alterations in original).

We have found no subsequent Delaware decisions which adopt the analysis applied in *Senior Housing*. We need not decide whether *Senior Housing* (a

-19-

non-precedential opinion) is correct on this point, however, because we take issue

with the district court's *application* of the principle to the facts in this case.

As discussed in the next section, the Managers failed to satisfy their burden

of demonstrating they relied in good faith on the Valuation Firms because genuine

disputes of material fact exist as to their conduct relating to the valuation process

as well as the valuation result itself. When considered cumulatively and in the

light most favorable to Mr. Leone, a reasonable jury could infer that the Managers

did not rely in good faith on the Valuation Firms.

## B. The District Court Erred in Ruling Mr. Leone's Evidence Was Insufficient to Demonstrate Breach of Good Faith

Mr. Leone contends that even if the district court did not misapply

Delaware law, it erred in granting summary judgment against him on his claim for

breach of the implied covenant of good faith. Specifically, he points to (1)

evidence of the Managers' lies to the Valuation Firms, (2) St. Charles' use of

financial numbers lower than MSP's internal numbers,[4] (3) the Managers'

misleadingly negative portrayal of MSP's financial future and (4) the Valuation

Firms' reliance on the Managers' misleading characterizations, all of which Mr.

---

[4]The Managers contend Mr. Leone did not preserve his argument regarding the discrepancy in financial numbers. They assert, correctly, that he raised the issue for the first time in his Supplemental Brief in Opposition to Defendants' Motion for Summary Judgment. But the Managers responded to the argument in their Supplemental Reply Brief, and the district court specifically addressed the merits of Mr. Leone's argument in its order granting summary judgment in favor of the Managers. We therefore address it.

Leone asserts were sufficient for his bad faith claim to survive summary judgment.

Drawing all reasonable inferences in favor of Mr. Leone, the district court determined that a reasonable juror could conclude: (1) the Managers told the Valuation Firms Mr. Leone's departure was not amicable and they needed a valuation figure to facilitate a negotiation; (2) the Managers wanted to terminate Mr. Leone's employment before he resigned and, because of his resignation letter, had negative feelings toward him at the time the valuations were conducted; (3) the Managers are financially sophisticated and understood MSP's value as a company; (4) the Managers characterized MSP as struggling, in part because of a decline in AUM, and suggested the company would not be around for more than two years; (5) the Managers told St. Charles that Mr. Leone took part of their book of business when he left, even though he did not take any clients; (6) the Managers intentionally withheld the investor newsletters from the Valuation Firms; (7) St. Charles used lower numbers for MSP's revenue and income than those listed on MSP's internal profit and loss statements; (8) the Managers were reluctant to produce the Duff & Phelps report to the Valuation Firms and argued that it was not relevant after they produced it; (9) in September 2012, Mr. Hayworth sent an email to his father stating he wished he could purchase plaintiff's stake himself because MSP was finally on stable ground; (10) Mr. Owsley declined to sell his stake in MSP for $1 million; (11) the Managers

-21-

refused to provide "updated financials" to Mr. Leone; and (12) MSP's funds have gone up since August 2012. *Id.* at 470-71.

Nonetheless, the district court held that the evidence and the reasonable inferences drawn from it were insufficient to demonstrate the Managers acted in bad faith. It stated, "As a general matter, the testimony of the individuals who conducted the valuations in this case does not indicate improper interference on the defendants' part." *Id.* at 472-73. Further, it found the inferences identified above raised no genuine issues of material fact. *Id.* at 472. Specifically, the court concluded the Managers' statements that the situation was not amicable and that they needed a number to facilitate negotiations did not rise to the level of improperly pressuring the firms. It also concluded that although the Managers' anger toward Mr. Leone and their financial savvy "provide circumstantial evidence of motive and means, . . . [i]t is important to note that [these conditions] were contemplated by the Operating Agreement, which gives the managing partners the right to force the sale of a departing member's stake at a price to be determined solely by the managing partners." *Id.* at 473.

As to the fact that the Managers painted an unrealistic "doom and gloom" picture of MSP's financial health, the court said:

> There is . . . no evidence that defendants gave St. Charles any false information with respect to MSP's performance, that St. Charles was unaware of the facts that plaintiff cites in support of his contention that MSP was doing well, or that defendants required St. Charles to adopt inaccurate or unreasonable assumptions.

-22-

*Id.* at 474-75. The court stated further:

> The only admissible evidence plaintiff offers in support of his
> contention that defendants did not believe that the company was
> struggling is Mr. Hayworth's email and Mr. Owsley's failure to reply
> to the consortium's offer to buy his stake in the company. However,
> as noted earlier, the fact that defendants had a motive to undervalue
> plaintiff's ownership in MSP does not constitute relevant evidence
> that defendants did undervalue plaintiff's stake.

*Id.* at 475.

Although the district court acknowledged a reasonable juror could infer the Managers "lied about plaintiff taking business with him," it concluded that "it is not reasonable to infer that this lie materially impacted St. Charles' report." *Id.* at 473. As to the inference that Managers intentionally withheld investor newsletters, the district court stated, "there is no evidence that the information contained in the newsletters was relevant to valuation of MSP as opposed to valuation of the assets being managed or that such information was not available in the other financial documents that defendants provided." *Id.* at 474. As to the fact that St. Charles used lower numbers for MSP's revenue and income than those listed on MSP's internal profit and loss statements, the court said that "there is no evidence that this discrepancy was improper or that St. Charles should have relied on different documents, such as MSP's tax returns." *Id.* at 473-74.

With respect to the inferences regarding Mr. Hayworth's email to his father and Mr. Owsley's refusal to sell his interest to Mr. Leone, the court acknowledged this was "admissible evidence . . . that defendants did not believe

that the company was struggling," but reiterated its view that "the fact that defendants had a motive to undervalue plaintiff's ownership in MSP does not constitute relevant evidence that defendants did undervalue plaintiff's stake." *Id.* at 475. Finally, the court rejected Mr. Leone's argument that the figures discussed in the Hedge Weekly performance review meant his 19.75% stake would have generated him $500,000 to $700,000 alone. The court stated, "Plaintiff does not provide any evidentiary support for his calculation of anticipated incentive fees." *Id.* at 475.

The district court held Mr. Leone's evidence was "not sufficient to permit a reasonable juror to infer that defendants engaged in the 'conscious doing of a wrong because of dishonest purpose, or moral obliquity.'" *Id.* at 471 (citing *SIGA Techs.*, 67 A.3d at 346). It determined there was no evidence the Managers provided material misinformation or withheld material information from St. Charles, pressured St. Charles to arrive at a particular result, presented MSP in a light they believed to be false, or imposed unreasonable assumptions on the firm's calculations. It concluded, "plaintiff has failed to raise a genuine dispute of material fact as to the procedural integrity of the valuation and, accordingly, the Court will not entertain a substantive review of the financial calculations performed." *Id.*

The district court's conclusions are troubling in a number of respects, including the fact that the court drew inferences in favor of the Managers rather

than plaintiff. First, a reasonable jury could infer that the Managers engaged in "the conscious doing of a wrong because of dishonest purpose or moral obliquity," *SIGA Techs.*, 67 A.3d at 346, when they told St. Charles that Mr. Leone took business with him when he left MSP. The court brushed off the significance of the Managers' comment, stating that even if they jury inferred the comment was a lie, it was "not reasonable to infer that this lie materially impacted St. Charles' report." *Id.* at 473. But the basis for the district court's conclusion appears to be the testimony of the Valuation Firms' personnel that their valuations were not influenced by the Managers' statements or conduct. A reasonable jury could conclude otherwise.

The district court relied primarily on the St. Charles report to support its conclusion because the INTRINSIC report was not actually a valuation report but a "calculation" report. *See id.* at 471 n.10 ("[T]he Court will focus its analysis primarily on whether the St. Charles report was commissioned and relied on in good faith."). The record is replete with evidence the St. Charles report relied heavily on the Managers' input in its preparation. For example, Adam Fiedor, the St. Charles employee in charge of the valuation, testified that in its financial forecast St. Charles, acting "as per [MSP] management," deducted the 20 percent incentive fees partners would ordinarily receive because majority funds were below the high water mark "and we thought it would take them a year or two to get back." *Id.* at 213, Fiedor dep. at 46:7-47:23. The day St. Charles sent the

Managers the first draft of the report, they contacted Mr. Fiedor and "called [his] attention to the continuing decline in the company," advising him that additional redemptions had lowered the AUM number, "[w]hich was a major part of our valuation." *Id.* at 215, Fiedor dep. at 54:15-56:10. The "situational overview" section of the draft report was based largely on input from the Managers. For example, after reviewing the initial draft of the St. Charles report, the Managers told Mr. Fiedor to assume a third-party investor or acquirer would not attribute value to a member's equity interest because "the partners' capitals have no incentive fee or management fee," which resulted in further adjustment of the valuation. *Id.* at 216, Fiedor dep. at 61:24-62:21. The statement in the situational overview that "[a]long with the majority of smaller hedge funds, management is experiencing a challenging operating environment for raising investor funds" was included after the Managers called this point to Mr. Fiedor's attention. *Id.* at 216, Fiedor dep. at 62:22-63:3, 63:18-25. Similarly, the statement in the situational overview that "[m]anagement expect the company to operate at break-even for several years," was based on input from the Managers. *Id.* at 217, Fiedor dep. at 64:25-66:2. Mr. Fiedor confirmed that the Managers told him they did not believe the company was going to break even those years. *Id.* at 217, Fiedor dep. at 66:11-14. Mr. Fiedor never asked for, nor was he provided, the AUM or "any financial data for prior to 2009." *Id.* at 213-14, Fiedor dep. at 48:13-49:8.

Second, the court held there was sufficient evidence for a reasonable juror

-26-

to conclude the Managers painted an unrealistically grim picture of MSP's financial health, but found there was no evidence the Managers gave St. Charles false information with respect to MSP's performance. Yet the narrative portion of the St. Charles report parrots the Managers' pessimistic forecasts, and the revenue and income numbers in the report are lower than MSP's internal revenue and income numbers. Based on this, a reasonable juror could conclude the Managers' conduct "deprived the appraiser's work of contractual integrity," thus compelling an inquiry into the substantive fairness of the evaluation. *See Senior Housing*, 2013 WL 1955012 at *26. Without an inquiry into the substantive fairness of the valuation, how can it be said with any level of confidence the pessimistic prediction did not taint the appraisers' work?

Similarly, the district court held Mr. Hayworth's email to his father and Mr. Owsley's refusal to sell his interest to Mr. Leone constituted admissible evidence that the Managers did not believe the company was struggling, but it dismissed the evidence because "the fact that defendants had a motive to undervalue plaintiff's ownership in MSP does not constitute relevant evidence that defendants did undervalue plaintiff's stake." Aplt. App. at 475. But without investigating the reasonableness of the valuation figures, how can the court conclude plaintiff's stake was not undervalued? Moreover, based on the Managers' conduct, a reasonable juror could conclude that the Managers did not believe the Valuation Firms' numbers and that their reliance on them was therefore in bad faith.

-27-

As previously noted, three different types of "good faith" were at play in this case: the express contractual provision, an implied covenant of good faith, and the statutory safe harbor for good faith reliance on experts' opinions. Regardless of which one applies, the Managers bore the burden as movants for summary judgment to establish there were no genuine issues of material fact with respect to their defense of good faith reliance on outside valuations. Although the Managers are entitled to a rebuttable presumption of good faith in relying on the outside valuations, Mr. Leone has raised genuine issues of material fact to rebut that presumption. Without the presumption and given the existence of fact issues regarding the Managers' good faith, we conclude the district court erred in granting summary judgment in favor of the Managers on their affirmative defense.

**V**

We REVERSE the decision of the district court and REMAND for further proceedings consistent with this opinion.