**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 13, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

THE DELONG COMPANY, INC.,

    Plaintiff - Appellant,

v.

SYNGENTA AG; SYNGENTA CROP
PROTECTION AG; SYNGENTA
CORPORATION; SYNGENTA CROP
PROTECTION, LLC;  SYNGENTA
BIOTECHNOLOGY, INC.; SYNGENTA
SEEDS, LLC,

    Defendants - Appellees.

No. 21-3044
(D.C. No. 2:17-CV-02614-JWL-JPO)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HARTZ**, **BACHARACH**, and **ROSSMAN**, Circuit Judges.

_____

In 2010, Syngenta (the name by which we will refer to the defendants

collectively) began selling corn seeds containing the genetically modified trait MIR

162 under the label Viptera, for planting in spring 2011. Syngenta did not have

import approval from China for MIR 162 at the time Viptera was released, but it

represented to customers that MIR 162 would be approved by China by the spring of

2012. Syngenta was mistaken; approval did not come and China began rejecting

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

1

shipments of U.S. corn products containing MIR 162 in November 2013. The trait was not approved until December 2014.

The DeLong Co., Inc., headquartered in Clinton, Wisconsin, is an exporter of dried distillers grains with solubles (DDGS), a corn-based ethanol byproduct frequently used as livestock feed. DeLong typically receives its DDGS from ethanol producers or other suppliers and then loads the product into containers bound for export. It has been exporting DDGS to China since at least 2010. Alleging that its export business was damaged when China began rejecting its DDGS shipments in December 2013, DeLong sued Syngenta on October 11, 2017, in the United States District Court for the Western District of Wisconsin. As relevant here, the complaint asserted a common-law negligence claim against Syngenta, and DeLong sought damages for trade disruption caused by Syngenta's conduct. The suit was transferred to the United States District Court for the District of Kansas as part of an ongoing multidistrict litigation (MDL). Syngenta raised a statute-of-limitations defense and moved for summary judgment on that ground. The district court granted the motion, holding that DeLong had not satisfied the applicable Wisconsin six-year statute of limitations because it suffered actual harm from Syngenta's negligence more than six years before commencing suit.

DeLong appeals from this dismissal, arguing that the district court erred in finding actual harm before October 2011 and that in any event the limitations period was tolled by a putative class action brought against Syngenta by a third party. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse. In our view there is a

2

genuine issue of fact concerning when DeLong first suffered harm from the use of

MIR 162. We need not consider whether there was any tolling by the class action.

## I.    WISCONSIN LAW

The parties agree that DeLong's negligence claim is governed by a Wisconsin

six-year statute of limitations. *See* Wis. Stat. §§ 893.52(1), 893.53. Under Wisconsin

law:

> [a] claim for relief accrues when there exists a claim capable of present
> enforcement, a suable party against whom it may be enforced, and a party
> who has a present right to enforce it. A tort claim is not capable of present
> enforcement until the plaintiff has suffered actual damage. Actual damage
> is harm that has already occurred or is reasonably certain to occur in the
> future. Actual damage is not the mere possibility of harm.

*Hennekens v. Hoerl*, 465 N.W.2d 812, 815–16 (Wis. 1991) (citation, footnotes, and

internal quotation marks omitted). Nominal damages are insufficient. *See id.* at 816

n.6. On the other hand, it need only be shown that there has been an injury to or loss

of a legal interest or right:

> Monetary loss is not the only form of actual damage. One form of actual
> damage is injury to a legal interest or loss of a legal right. Injury to a legal
> interest or loss of a legal right often occurs without a contemporaneous
> monetary loss. However, we have held that injury to a legal interest or loss
> of a legal right constitutes actual damage before such an injury or loss
> produces monetary loss.

*Id. at* 816. Such loss of a legal right could be the loss of the right to rescind a

transaction and avoid liability on a promissory note, *see id.* at 816–17; the loss of the

right to a patent, *see Boehm v. Wheeler*, 223 N.W.2d 536, 541 (Wis. 1974) ("We

think that the loss of the right to a patent is the loss of the right to exclude others . . . .

The right to exclude others is a valuable right and the loss of it would be an injury

3

which would commence the running of the statute of limitations."); or a beneficiary's loss of rights under a trust, *see French v. Att'y's Liab. Assurance Soc'y*, 881 N.W.2d 358, *7 (Wis. Ct. App. 2016) (unpublished) (per curiam) (injury to trust beneficiary because negligently drafted trust documents permitted trustee to engage in conflicts of interest).

Merely being aware of a risk, however, is insufficient for accrual. For example, in *General Accident Insurance Co. v. Schoendorf & Sorgi*, 549 N.W.2d 429, 431 (Wis. 1996), a law firm was sued for negligently drafting a company's pension plan. The company learned of the problem and asked a second firm to correct the plan, which the second firm failed to undertake. *See id.* at 430–31. The Wisconsin Supreme Court held that the company suffered harm only when the IRS ultimately disqualified the plan. *See id.* at 434–35. The court cautioned against a view of "actual damage" that would compel "the premature filing of lawsuits at the first faint scent of potential injury." *Id.* at 435 n.13 (internal quotation marks omitted); *see Meracle v. Children's Serv. Soc'y of Wis.*, 421 N.W.2d 856, 858–59, 858 n.12 (Wis. Ct. App. 1988) (although parents of adopted child had learned that child had 25% risk of having Huntington's Disease, claim for monetary damages because adoption agency had promised a healthy child did not accrue until child was diagnosed with the disease).

## II.    STANDARD OF REVIEW

We review de novo the grant of summary judgment by the district court, applying the same standard that the district court is to apply. *See Thom v. Bristol-*

*Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in its favor. *See Thom*, 353 F.3d at 851. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Id.*

The moving party has the initial burden to demonstrate that there is no genuine issue of material fact. *See id.* "'In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment.'" *Leone v. Owsley*, 810 F.3d 1149, 1154 (10th Cir. 2015) (quoting 11 *Moore's Federal Practice* § 56.40[1][c] (3d ed. 2015)). Only once this initial burden is met does "the burden shift[] to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial." *Id.* at 1153 (internal quotation marks omitted); *see* 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.40[1][d] (3d ed. 2022) ("A movant who fails to satisfy its initial summary judgment burden is not entitled to summary judgment *regardless of the nonmovant's response or lack of response*." (emphasis added)).

### III.    WHEN WAS DELONG FIRST INJURED?

DeLong filed suit on October 11, 2017. To show that the suit was untimely, Syngenta pointed to several examples of alleged actual harm suffered by DeLong before October 2011. The evidence is certainly suggestive. But at this stage of litigation, all inferences must be drawn in favor of the nonmovant DeLong, and

5

Syngenta failed to pin down the facts so that no reasonable person could disbelieve that DeLong suffered harm before October 2011. *See Leone*, 810 F.3d at 1154. We proceed to address Syngenta's examples.

### A.    Preparations for Isolating MIR 162 Corn

The primary harm identified by Syngenta was the alleged cost associated with protective steps DeLong took in arranging to deal with the possible receipt of MIR 162 corn products. Syngenta relies on deposition testimony of Bo DeLong, a company vice president, who discussed the arrangements:

Q. And at that time [the fall of 2010], did DeLong begin taking preparations – and at that period of time, did DeLong begin engaging in preparations to direct farmers who were growing and delivering MIR162 corn to bring their product to certain DeLong facilities?

A. That's correct, and the one in point is Sharon.

Q. Was there a cost associated with that?

A. A cost to the producer.

Q. Was there a cost to DeLong associated with it?

A. Well, we had to isolate it. We had to have a separate dump facility. We didn't know how much we were going to receive, although we thought the amounts were going to be fairly minimal based on what Syngenta told us or what we had been told as far as the amount that was grown initially the first year.

And so we basically tied up, you know, a separate dump pit, leg dryer, wet holding tank and a finished product tank that we tied up for that corn to keep it isolated.

Q. And when did you start these preparations for isolation? Was it spring of 2011?

A. No. Probably August or September before harvest.

Q. August or September of 2011?

6

A. That's correct.

Q. Could you roughly quantify the costs associated with the preparations for segregating these dump pits and the leg dryer?

A. No.

Q. Between the time of commercialization and the time MIR162 is approved for import into China in December of 2014, were those the only three DeLong facilities that knowingly accepted MIR162 corn?

A. I believe so.

Aplt. App., Vol. XII at 170. Syngenta suggests that there must have been costs associated with these preparations. But Mr. DeLong never admitted that his company incurred any costs. When asked directly about preparation costs, Mr. DeLong identified parties other than DeLong as having costs. When pressed on whether DeLong itself had any costs of its own, Mr. DeLong did not say "yes," but instead described the actions DeLong took, without stating that there were any associated monetary costs. He then said he could not quantify any costs associated with these steps and, in a later declaration, stated there were in fact "no quantifiable costs" associated with these preparations.[1] Aplt. App., Vol. XIII at 153. We think it is not obvious that setting aside an area and certain equipment for MIR 162 corn required his company to incur any equipment costs or even additional labor expenses. Perhaps a jury could infer that there were additional costs; but it could also decline to infer that. For whatever reason, counsel for Syngenta decided not to try to pin the matter down.

---

[1] The district court stated it would disregard this declaration as a "sham" that contradicted his deposition testimony. Respectfully, we see no conflict.

Compare what happened in *Schoendorf*. The company had clearly taken action in response to the relevant negligence: It had gone so far as to reach out to and secure a second firm to correct the negligently drafted retirement plan. 549 N.W.2d at 430–31. Undoubtedly this involved some employee time. But that was not considered actual damage because there was not yet monetary harm. *See id.* at 434–35.

Syngenta contends that the Wisconsin Supreme Court decision in *State v. Service Electric & Supply, Inc.*, 316 N.W.2d 390, 395 (Wis. 1982), stands for the proposition that "the need to redirect corporate resources such as employee time constitutes a compensable injury." Aplee. Br. at 33. But we do not read that opinion so broadly. As we understand it, the court was recognizing an exception to the longstanding rule that overhead expenses, such as normal salary expenses of an employee, are not recoverable, *see Edward E. Gillen Co. v. John H. Parker Co.*, 171 N.W. 61, 68 (Wis. 1919). What was special in *Service Electric* was that the supervisor whose salary was to be recovered had been assigned specifically to the breached contract to obtain a new contractor and otherwise would have been working on other projects that instead went undone. *See* 316 N.W.2d at 394. Of particular relevance to this case, the court distinguished the decision in *Walker Manufacturing Co. v. Henkel Construction Co.*, 346 F. Supp. 621, 633 (N.D. Iowa 1972), with the following parenthetical: "[C]ompany denied recovery of salaries of three of its workers whose services were expended supervising the replacement of a defective roof installed by the original contractor because there was no sufficient indication at trial as to what these employees would have been doing had they not been working

8

on the roof problem. The amount of time the employees spent working on this project has not been shown as an expense solely attributable to the breach." (brackets, ellipsis, and internal quotation marks omitted). That description fits the record in this case better than *Service Electric* does.

### B.    Bo DeLong's Proposal

Syngenta also argues that Mr. DeLong admitted his company had incurred expenses when he submitted a proposal in August 2011. The proposal was a single-page document setting forth a number of steps that Syngenta and others in the industry should take to keep DDGS produced from Viptera corn from entering the export channel to China. The steps that "the Agricultural Community should adopt" were to mitigate possible negative effects from the introduction of Viptera. Aplt. App., Vol. IX at 149. Of particular note, the final step was for Syngenta to pay "[a]ll costs of testing/diversion both on inbound corn and outbound DDGS." *Id.* at 151.

The proposal is forward looking. Rather than reflecting previous harms incurred, it outlines "steps that *should* be taken." *Id.* (emphasis added). Syngenta points to testimony by Mr. DeLong that it reads as a concession that DeLong had already incurred expenses resulting from Syngenta's alleged negligence. But Syngenta's interpretation of the testimony is not mandatory. The statement must be read in context:

> Q: And the last bullet here you wrote: All costs of testing/diversion both on inbound corn and outbound DDGS should be to Syngenta's account. Do you see that?
>
> [Bo DeLong]: Yes.

9

Q. Did you mean that – was your view in August – strike that.

Does this reflect that your view in 2011 was that Syngenta should be responsible for reimbursing DeLong and others in the grain trade for the additional costs that DeLong was incurring as a result of dealing with the commercialization of MIR162?

A. That's what it says, yes.

*Id.* at 1. There are no follow-up questions in the record to clarify or elaborate on this statement. The language relied on by Syngenta—"additional costs that DeLong was incurring"—did not come from Mr. DeLong himself, but was part of a multipart complex question. We think a jury could reasonably understand the testimony as stating only that Syngenta should be responsible for any additional costs that DeLong would incur. And the precise language of the question is only whether DeLong was incurring costs "in 2011," not necessarily by October 2011.

We also note that the only specific mention of "costs" in the proposal is in the final sentence: "All costs of all testing/diversion both on inbound corn and outbound DDGS should be to Sygenta's account." *Id.* at 151. But it is clear from the context that these costs would not have been incurred by DeLong when the proposal was sent out. Testing on inbound corn is listed in the proposal as a step to be performed by the ethanol plants receiving and processing the corn itself, not by DDGS exporters such as DeLong. The document also states that there is no available strip test for DDGS, which in practice would be needed for an exporter like DeLong to determine whether DDGS is contaminated with MIR 162 and then divert it from the export channel, so it is not reasonable to assume DeLong had incurred those costs either.

Again, if Syngenta believed this proposal reflected ongoing MIR 162 expenses as of August 2011, its attorney could have asked Mr. DeLong follow-up questions to specify what those expenses were. That was not done. A rational jury could infer that there were no such expenses.

### C.    Contractual Changes

Third, and finally, Syngenta argues that DeLong must have lost money as a result of insisting before October 2011 that its customers agree to a new contractual provision requiring them to assume all financial risk that DDGS shipments would be rejected by China. In support of this argument Syngenta points to an email from one of DeLong's brokers stating that the proposed contractual provision would prevent sales of its product as the terms would "not be accepted by the customers." Aplt. App., Vol. IX at 168.

DeLong responds, however, that there is no evidence anywhere in the record, much less before October 2011, that it lost any customers or suffered any harm from the revision. It contends that the brokers were simply mistaken and their fears unfounded. It notes support in the record for the proposition that the new contract provision merely reflected the common understanding in the industry and imposed nothing new.

Syngenta does not claim that there is any evidence of lost customers or reduced prices. Rather, it points to the testimony of Drew McClymont, a member of DeLong's export sales team, who, during questioning about the consequences of this contract language, agreed that DeLong's business had been affected by MIR 162 in September 2011. But Syngenta has not pointed to evidence of any specific effect

except that DeLong's sales team had to field questions from customers about the contract provision. As we previously explained when discussing the protective actions taken by DeLong, however, this use of regular personnel is not the type of injury that begins the accrual of a claim. On the record now before this court, a rational jury could find that DeLong did not suffer harm related to this contract provision.

Syngenta is correct that harm does not need to be monetary, but it has not identified any other harm that would start the limitations period. DeLong is seeking only monetary damages, and there appears to be no other legal interest, such as the right to file a patent, that has been lost.

## IV. CONCLUSION

The decision below is **REVERSED** and this suit is **REMANDED** for further proceedings consistent with this order.

Entered for the Court

Harris L Hartz
Circuit Judge

12