RENDERED: OCTOBER 14, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0511-MR

KENNETH RAYMOND SCHOMP
AND QUALITY LOGISTICS, LLC                                    APPELLANTS


                        APPEAL FROM FAYETTE CIRCUIT COURT
v.                      HONORABLE LUCY A. VANMETER, JUDGE
                        ACTION NO. 18-CI-04270



WILLIAM O. HOLTON, IV,
INDIVIDUALLY AND
DERIVATIVELY ON BEHALF OF
QUALITY LOGISTICS, LLC                                          APPELLEE

AND



                        NO. 2021-CA-0557-MR

WILLIAM O. HOLTON, IV,
INDIVIDUALLY AND
DERIVATIVELY ON BEHALF OF
QUALITY LOGISTICS, LLC                                    CROSS-APPELLANT


                CROSS-APPEAL FROM FAYETTE CIRCUIT COURT
v.              HONORABLE LUCY A. VANMETER, JUDGE
                        ACTION NO. 18-CI-04270

KENNETH RAYMOND SCHOMP
AND QUALITY LOGISTICS, LLC                    CROSS-APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; COMBS AND JONES, JUDGES.

JONES, JUDGE:  Following a bench trial, the Fayette Circuit Court entered a final judgment in favor of William O. Holton, IV with respect to the value of his prior interest in Quality Logistics, LLC.  The parties appealed, and their appeals were consolidated.  Having reviewed the record and being otherwise sufficiently advised in the law, we affirm.

## I. BACKGROUND

Kenneth Raymond Schomp founded Quality Logistics LLC ("QL"), a transportation brokerage company, in 2011.  Approximately two years later, he hired William O. Holton, IV.  In 2014, Schomp and Holton entered into an incentive agreement whereby Holton was able to acquire an ownership interest in QL.  By January 2017, Holton had acquired 40 ownership units in QL making him a 30.769% owner of the business.  The remaining units were owned by Schomp.  Sometime around 2018, Schomp and Holton became increasingly dissatisfied with one another.  Ultimately, Schomp, as the majority owner, decided to terminate

Holton and force a buy-out of Holton's QL units pursuant to QL's Second Amended Operating Agreement ("OA").

On November 2, 2018, QL, by and through Schomp, notified Holton in writing of its decision to terminate Holton's employment. Further, QL indicated that because Holton's termination was a "Disqualifying Event" pursuant to Section 8.e. of the OA, it was also exercising its right to "require the purchase" of Holton's shares in accordance with Section 8.d., which sets forth the method for determining the value of QL and the outstanding units. Pursuant to these two sections, Schomp, to whom QL had assigned its rights, notified Holton he would purchase Holton's 40 units in QL for a total appraised value of $884,559.

Holton refused to sell his units at the price quoted in Schomp's letter and took issue with how the units had been appraised. He later notified Schomp that his own appraiser, Calvin Cranfill, had assigned his units a substantially higher value. After Schomp refused to purchase the units at the higher value, Holton filed the underlying suit in Fayette Circuit Court against Schomp and QL.[1] In his suit, Holton sought a declaratory judgment regarding the value of his units of QL. Over the next several years, the litigation focused heavily on how to interpret and apply the two key provisions of the OA, Sections 8.d. and 8.e.

---

[1] We recognize that Holton's suit named both Schomp and QL as defendants and that both are likewise named as parties in the appeal and cross-appeal. However, in the remainder of this Opinion we refer to them collectively as "Schomp" when discussing the underlying suit and the present appeals.

Section 8.e., entitled "Disposition of Units Upon Disqualifying

Event," provides:

The Company shall have the right to purchase, and the Member shall have the right to require the Company to purchase, the Member's interest in the Company, upon or anytime after the Managing Member reasonably determines that a Disqualifying Event has occurred with respect to that Member. A Disqualifying Event for a Member shall be: (i) the termination for any reason, voluntary of [sic] involuntary, of employment by the Member with the Company; (ii) breach of this Agreement by the Member; (iii) any breach by the Member of any other agreement between the Member and the Company; or (iv) any failure to guaranty obligations of the company as determined by the Managing Member. However, if the Disqualifying Event is a result of death of the Member, the provisions of Section 8.d. shall apply in lieu of this provision. Notwithstanding the foregoing, in the event of a Disqualifying Event of the Managing Member, the Managing Member shall not be required to sell the Managing Member's interest, and such interest shall remain owned by the Managing Member. A Member or the Company wishing to exercise its right to purchase or require the purchase under this provision shall give notice in writing to the Company and the other Members. The purchase price shall be the fair market value of the interest as determined by the procedure set forth in Section 8.d., without reference to insurance. The purchase price shall be paid, and the interest transferred, within sixty (60) days of the notice. At the option of the purchaser, the purchase price may be paid by tendering 25% of the purchase price to the selling Member, at which tiem [sic] the Member's interest shall be deemed tranfered [sic], with a promissory note for payment of the balance of the purchase price over a three-year period, with equal installments to be paid quarterly without interest. The Company may assign its right or obligation

-4-

to purchase to another Member or a third party, in the Company's sole discretion as determined by the Managing Member.

(Emphasis added.)

Section 8.d. provides the method for calculating the fair market value of a member's ownership units as follows:

Death of a Member. Upon the death of a Member, the Member's estate or beneficiary or beneficiaries, as the case may be, shall be entitled to receive from the Company, in exchange for all of the deceased Member's Ownership Interest, the fair market value of the deceased Member's Ownership Interest, adjusted for profits and losses to the date of death. Fair market value may be determined informally by a vote of the holders of a Majority Interest of all Units of Membership then outstanding and entitled to vote, or by the written assent of such Members. In the absence of an informal agreement as to fair market value, the Managing Member shall hire an appraiser to determine fair market value. The cost of any appraisal shall be deducted from the fair market value to which the deceased Member's estate or beneficiary or beneficiaries is or are entitled. In the event that the Company has purchased insurance on the life of the deceased Member, (i) the fair market value shall be the value provided to the insurer; and (ii) the proceeds from such insurance, to the extent they are based on such fair market value (that is, not including additional amounts for which insurance may be obtained) shall be used to purchase the deceased Member's interest, which proceeds shall be paid to the estate or beneficiaries of the deceased member within 60 days of receipt of such proceeds from the insurer. In the event no such insurance exists, the Company may elect, by written notice to the deceased Member's estate or beneficiary or beneficiaries, within thirty (30) days after the Member's death, to purchase the deceased Member's Ownership Interest

over a one-year (1 year) period, in four (4) equal installments, with the first installment being due sixty (60) days after the Member's date of death. Prior to the completion of any such purchase, the Member's estate or beneficiary or beneficiaries shall have no right to become a Member or to participate in the management of the business and affairs of the Company as a Member, and shall only have the rights of an Assignee and be entitled only to receive the share of profits and the return of capital to which the deceased Member would otherwise have been entitled. Notwithstanding the foregoing, in the event of the death of the Managing Member, the Company shall not be required to sell the Managing Member's interest, and such interest shall thereafter continue in the estate (and ultimately the beneficiaries) of the Managing Member.

Broadly summarized, the circuit court was tasked with interpreting Sections 8.d. and 8.e. consistently with both the explicit terms of the OA and the implied covenant of good faith and fair dealing. It did so by adjudicating several dispositive motions and conducting a bench trial. Ultimately, the circuit court concluded that the fair market value of Holton's outstanding shares was $1,804,878, a substantially higher sum than Schomp had originally proposed. The circuit court added prejudgment interest at the rate of 8%, compounded annually from January 1, 2019, until paid, for a total judgment in Holton's favor of $2,150,889, as of April 10, 2021. This appeal and cross-appeal followed.

## II. STANDARD OF REVIEW

This is an appeal from a bench trial. The factual findings of the trial court will not be set aside unless clearly erroneous. CR[2] 52.01. Although we grant a high degree of deference to factual findings, "appellate review of legal determinations and conclusions from a bench trial is *de novo*." *Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016).

## III. CROSS-APPEAL NO. 2021-CA-0557

The arguments Holton puts forth in cross-appeal No. 2021-CA-0557[3] concern: (1) the circuit court's interpretation of the nature of his right to dispute QL's appraisals of his ownership units, pursuant to Sections 8.d. and 8.e. of the OA; and (2) the circuit court's ultimate decision to accept an appraisal by John Herring as an adequate valuation of his units' fair market value.

### A. *The nature of Holton's right to dispute any of QL's appraisals*

Schomp's initial position throughout much of the underlying proceedings – as outlined in a motion for partial dismissal he filed on January 3, 2019 – was that the "procedure set forth in Section 8.d." entitled him to hire *anyone* he deemed an "appraiser" to give Holton's units *any* "fair market value,"

---

[2] Kentucky Rule of Civil Procedure.

[3] Although unusual, we begin our review with the cross-appeal, rather than the appeal, because its arguments require a more thorough consideration of the facts of the case. In addition, we determined that arguments made in the cross-appeal could affect and possibly moot the arguments made in the appeal.

and to require Holton to sell at that price.[4]  Schomp insisted the explicit language of Sections 8.d. and 8.e. provided Holton no means for contesting how his units were valued or for resisting their sale.

Holton, on the other hand, argued he had a right to contest QL's appraisal.  He also argued that Sections 8.d. and 8.e. – which provided that Schomp could hire "an appraiser" – at most gave Schomp the right to hire only the first of a possible succession of appraisers.  Holton reasoned that if the circuit court ultimately determined the appraiser Schomp hired was unqualified or had otherwise acted inappropriately in conducting the initial appraisal, Sections 8.d. and 8.e. entitled the circuit court to consider any other relevant evidence (including his own appraisal from Calvin Cranfill regarding his units' value) and to conduct a *de novo* review of the value of his ownership units.

The circuit court resolved these issues over the course of two separate orders.  First, in a December 23, 2020 order of partial summary judgment, it explained:

> *PECO*[5] concerned a similar valuation dispute.  In that case, the operating agreement provided the company

---

[4]  In ascertaining the "fair market value" of Holton's units, Schomp did not attempt to utilize his authority as the majority unit holder, pursuant to Sections 8.d. and 8.e., to determine fair market value "informally" by vote – which, based solely upon the explicit language of those provisions, would have entailed only Schomp's vote on a valuation that only Schomp created.  Accordingly, any effect that the implied duty of good faith and fair dealing would have had upon that aspect of Sections 8.d. and 8.e. is a non-issue.

"must engage at its cost 'a nationally recognized valuation firm . . . to determine the Fair Market Value of the Put Units as determined by the Valuation Firm in accordance with this Agreement . . .'" *Id*. at *2. The operating agreement specifically set out the formula to be used by the valuation firm and stated the parties "shall be bound by the determination of the Valuation Firm . . . pursuant to this Section 9.2(b) and the terms of this Agreement." *Id*. at *4.

In *PECO*, the Court noted there are three conceptual levels of judicial review of appraisals that may be used in an operating agreement:

> ***First***, the ***parties could agree to de novo judicial review***, with the calculated valuation merely acting as a starting point for the reviewing court in case of a dispute. ***Second***, as an intermediate level of review, the ***parties could choose to appoint an appraiser to determine a valuation, and designate that appraiser as an arbitrator should the parties disagree on the valuation***, with review of the appraiser's decision limited to whatever statutory or private regime is chosen to govern the arbitration. ***Third***, the ***parties could agree to a regime in which the appraiser's valuation is final, thereby precluding judicial or any other form of review of the appraiser's substantive determination of value***. The rationale for this final option is captured in a rhetorical question the Chancellor posed in *Senior Housing*:[6]

---

[5] *PECO Logistics, LLC v. Walnut Inv. Partners, L.P.*, No. CV 9978-CB, 2015 WL 9488249 (Del. Ch. Dec. 30, 2015).

[6] *Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*, No. CIV.A. 4586-CS, 2013 WL 1955012 (Del. Ch. May 13, 2013).

> *'When parties contractually decide to have a qualified expert with relevant credentials make a determination of value without any indication that the expert's judgment is subject to judicial review, on what basis would it make sense to infer that the parties intended to have a law-trained judge do a de novo review of the expert's determination?'*

*Id*. at \*10 (emphasis added). The *PECO* court held the parties, by agreeing to be "bound" by the appraisal, chose the third method which does not provide for judicial review. In other words, the Court would not second guess the judgment calls made by the appraiser. *Id*. at \*10.

However, the *PECO* court noted there is an implicit duty of good faith and fair dealing such that even parties who agree to be "bound" by an appraisal may seek judicial review to ensure the "appraiser's determination was the product of good faith, independent judgment." *Id*. at \*11. The Court explained the scope of judicial review as follows:

> Even in this [third] scenario . . . *it is not the case that a party bound by an appraiser's determination has no procedural protections*. In such a scenario, it is a contractual expectation that the appraiser make a good faith, independent judgment about value to set the contractual input. *If one of the parties to the contract takes action to taint the appraisal process – for example, by providing the appraiser with false financial statements – a court can of course protect the injured party. Such judicial review* would not, however, involve second-guessing the good faith judgment of the appraiser or examining the appraiser's

valuation judgments for consistency with a judge's understanding of relevant corporate finance principles. It ***would instead involve a judge determining that a party had breached the contract's implied covenant of good faith and fair dealing, and that this breach, as its proximate result, deprived the appraiser's work of contractual integrity***. ***Thus, judicial review is not unavailable, but is restricted to considering a claim that the appraisal is unworthy of respect because it does not, as a result of contractual wrongdoing, represent the genuine impartial judgment on value that the contract contemplates***.

*Id*. (emphasis added).

In *Leach v. Princeton Surgiplex, LLC*, 2013 WL 2436045 (N.J. Super. Ct. App. Div. June 6, 2013), the Court similarly held "[i]mplied in the operating agreement must be an understanding that the appraiser will utilize accepted professional norms and that a party to the operating agreement reserves the right to challenge the appraisal's results upon the appraiser's failure to conform to accepted standards." *Id*. at *3. The Court further explained:

> ***[S]uch a contractual provision [regarding fair market valuation] does not eliminate all grounds for attacking the appraiser's methodology or results***.
>
> *** *** ***
>
> First, we discern from plaintiff's arguments that he contends it would frustrate the purpose of the buy-out provisions to assume those provisions preclude any inquiry into the appraiser's methods, the information

-11-

considered by the appraiser, the calculations made, or the conclusions drawn by the appraiser, even though the agreement does not contain any provisions for questioning of the appraisal.  We agree.  The operating agreement expressly designates the appraiser (or its substitute) and directs a determination of Surgiplex's fair market value.  ***It cannot be seriously argued that the appraiser is entitled to determine fair market value by spinning a wheel or flipping a coin, or that the appraiser may consider less than all relevant evidence, or that no party could question a mathematical error in the appraiser's calculations.  Implied in the operating agreement must be an understanding that the appraiser will utilize accepted professional norms and that a party to the operating agreement reserves the right to challenge the appraisal's results upon the appraiser's failure to conform to accepted standards***.

*Id*. at *2 (emphasis added).  *See also Leone v. Owsley*, 810 F.3d 1149, 1155 (10th Cir. 2015) (holding, "at the time the parties entered into the Operating Agreement they clearly would have expected a 'good faith' valuation of their ownership interests would require the Managers to refrain from taking action that would result in an unreasonably low figure.  Focusing on the express contractual provision, one would expect the same fidelity at the time of the valuation.")

In the subject OA, the parties agreed the "purchase price ***shall be*** the fair market value of the interest as determined by the procedure set forth in Section 8.d."  In turn, Section 8.d. provides "the Managing Member shall hire an appraiser to determine fair market value."

> By employing the mandatory "shall," the parties agreed to be bound by the appraisal of the firm selected by the Managing Member. The plain language of the OA does not contemplate *de novo* judicial review. Accordingly, the Court will not second-guess the good faith judgment of the appraiser. However, implied in the OA is a duty of good faith and fair dealing.

The circuit court also rejected Holton's additional argument that Sections 8.d. and 8.e. entitled it to conduct a *de novo* review of the value of his ownership units if it ultimately determined the first appraiser was unqualified or had otherwise acted inappropriately in conducting the appraisal. In a subsequent order of April 1, 2021, in which the circuit court rendered its post-trial findings of fact and conclusions of law, the circuit court concluded the OA "does not prohibit [Schomp and QL] from proffering an alternative opinion in the context of Holton's legal challenge."

To be clear, there is now no dispute among the parties that the *first* appraisal Schomp commissioned relative to this matter (from Daniel King) was entitled to the deferential level of review described by the circuit court, set forth above; and that the circuit court otherwise properly applied the law, and properly interpreted Sections 8.d. and 8.e. of the OA, in rejecting it; indeed, no one asserts any argument to the contrary. *Why* the circuit court rejected King's appraisal will be a subject of greater discussion later in this Opinion, in the context of a separate

-13-

issue involving prejudgment and post-judgment interest raised by Schomp in appeal No. 2021-CA-0511.

However, in cross-appeal No. 2021-CA-0557, Holton argues the circuit court erred in determining that a *subsequent* appraisal Schomp elected to obtain (from John Herring) was *also* entitled to that deferential level of review. As he did below, Holton asserts that the explicit language of the OA – stating Schomp had the right to hire "an appraiser" – indicates that Schomp should not have had any right to "a second bite at the appraisal apple." In his view, since the circuit court rejected the *first* appraisal, Schomp did not have the right to expect that any subsequent appraisal he commissioned would be entitled to the same level of deferential review. Instead, Holton asserts that in that situation, the circuit court should have made a *de novo* determination of QL's fair market value and should not have afforded either of Schomp's appraisals any sort of presumptive weight.

Here, the explicit language of the OA was silent regarding whether Holton had any means of contesting an appraisal. And, if he never had any means of contesting an appraisal, Schomp would never have had any need to commission more than one appraisal. Nevertheless, as the circuit court properly held, the implied covenant of good faith and fair dealing *did* provide Holton a limited means of contesting the appraisal of his units' fair market value, consistent with the OA. Indeed, absent any means of challenging Schomp's appraisal, the "fair market

value" mandate of the appraisal "procedure" of Sections 8.d. and 8.e. would have been rendered superfluous; any "appraiser" Schomp commissioned could conduct a valuation by simply flipping a coin or spinning a wheel, and those sections would, as a practical matter, have amounted to nothing more than unenforceable forfeiture provisions. *See, e.g.*, *Man O War Restaurants, Inc. v. Martin*, 932 S.W.2d 366, 368 (Ky. 1996) (citations omitted) ("Equity detests forfeiture provisions and frequently will find them unenforceable.").

In other words, providing Holton a means of contesting the company's first appraisal was certainly a term the parties would have agreed upon during their original negotiations, had they thought to explicitly address that matter. But this, in turn, begs the question Holton poses: If Holton successfully contested the *first* appraisal, what about the *second*? Holton would have us determine that once the first appraisal was rejected, he essentially stood on equal ground with Schomp such that the circuit court was free to conduct its own valuation of QL and to rely on any and all evidence it deemed competent in doing so.

This is where it is important to understand how an implied covenant of good faith and fair dealing actually operates. The implied covenant generally imposes on contractual parties "a duty to do everything necessary" to carry out their contract. *Farmers Bank and Trust Co. of Georgetown, Kentucky v. Willmott*

-15-

*Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005). To that end, it is a means of implying terms which are essential to a determination of the rights and duties of parties to a contract, which the parties would have agreed to during their original negotiations if they had thought to explicitly address them. For example, when a contract does not explicitly specify a time for performance, a "reasonable time" is implied by virtue of the covenant. *See Greg Coats Cars, Inc. v. Kasey*, 576 S.W.2d 251, 252 (Ky. App. 1978).

As the circuit court observed, nothing in the OA provided Holton any right to have an appraiser of *his* choosing or to have the circuit court (sitting *de novo*) value his shares in any binding way. Recall, the valuation procedure Holton agreed to was for "the Managing Member" (Schomp) to "hire an appraiser to determine fair market value," per Section 8.d.; and, per Section 8.e., Holton further agreed "[t]he purchase price *shall* be the fair market value of the interest as determined by the procedure set forth in Section 8.d. without reference to insurance." (Emphasis added.) The overarching purpose of the limited review process Holton was entitled to litigate was to determine whether Schomp had fulfilled his duties relative to that valuation procedure, which entailed essentially two overarching determinations from the circuit court: (1) whether Schomp had, within the bounds of good faith and fair dealing, hired "an appraiser"; and (2)

whether the appraiser, within the bounds of good faith and fair dealing, had assigned a "fair market value" to Holton's units.

In other words, any judicial determination that Schomp failed to fulfill either of those duties would not logically lead to the result advanced by Holton; rather, it would merely indicate that Schomp had *not*, as of yet, fulfilled his duty to "hire an appraiser to determine fair market value." As stated, the circuit court concluded the OA "does not prohibit Defendants from proffering an alternative opinion in the context of Holton's legal challenge." If Schomp's *first* appraisal violated the duty of good faith and fair dealing, it would not have qualified as the type of "appraisal" that the parties would have contemplated during their original negotiations, had they thought to explicitly address that matter. Thus, it was consistent with the parties' bargain, as well as principles of specific performance, to continue to recognize Schomp's sole right to hire an appraiser to value Holton's units and to accord the subsequent appraisal the deference demanded by the contract. Holton's position is not grounded in the contract's terms. Therefore, we find no error with the circuit court's decision to accord the second appraisal deference.

### B. The circuit court's valuation of Holton's units

Again, Schomp ultimately had Holton's units "appraised" *twice* – once by Daniel King, QL's longtime accountant, and several months afterward by

John Herring. Utilizing the standard of review set forth above, the circuit court accepted Herring's appraisal as an adequate valuation of Holton's ownership units. Holton's remaining argument in cross-appeal No. 2021-CA-0557 is that the circuit court erred in doing so.

In its April 1, 2021 order, the circuit court summarized the evidence related to this argument in detail. In short, the circuit court recognized that QL experienced significant growth from 2014 to 2017. For example, in 2014 QL had a brokerage revenue of $6,655,635.79 and hired three new brokers. By 2018, it had a brokerage revenue of $30,972,725.72 and hired eighteen new crew members. Its gross profits in 2018 exceeded $72,000,000. Due to the nature of QL's business, its expenses were quite high. In addition to payroll, fuel, and carrier expenses, QL regularly incurred expenses for travel, entertainment, and meals (collectively referred to as travel-related expenses). The travel-related expenses were usually charged on a company credit card by employees. In 2014, QL's travel-related expenses were $45,348. By 2018, the travel-related expenses had risen to $467,341. While Holton acknowledged that approximately $180,000 of the travel-related expenses were legitimate, he contended that QL's employees regularly abused the company credit card by charging personal items to the company, a

practice which the company both tolerated and encouraged.[7] QL's poor record keeping made it extraordinarily difficult to ascertain which of the travel-related expenses were legitimate. For 2018, Schomp admitted that at least $148,252.30 in personal expenses were claimed as "business expenses" on company financial records. While Schomp claimed the remaining balance of $319,088.70 was for legitimate business expenses, QL had no records to substantiate his claim.

Regarding the Herring appraisal, the circuit court's summary was as follows:

> QL subsequently hired appraiser John Herring of Dean Dorton Allen Ford PLLC. Herring is a CPA and a member of the American Institute of CPAs ("AICPA").
>
> As to King's Appraisal, Herring testified the capitalization of earnings method using the weighted averages should not have been used for the valuation of QL. Herring testified that methodology is appropriate only when a company has stable cash flow. Here, QL had experienced significant recent growth.
>
> Herring used a discounted future net cash flow method. Because his methodology was tied to net revenue for 2018, it was necessary to begin with an accurate figure for net income.
>
> In this case, Herring believed the 2018 expenses for travel and entertainment were "notable." He testified the test for normalization is whether a private equity firm would pay the expenses for a business of this type.

---

[7] Schomp admitted that both he and his girlfriend charged personal expenses to the company credit card. Holton likewise admitted that he was encouraged to charge personal expenses to the company credit card. The evidence suggested other employees did so as well.

-19-

Herring asked a "fairly standard question" of Schomp regarding whether there were any non-business expenses running through the business. At his request, Schomp undertook a review of company credit card invoices for 2018 and, as set out above, allocated $148,252.30 of claimed business expenditures to personal expenses (although Schomp's review was limited to the first three quarters of 2018).

Herring accepted Schomp's analysis without question and did not conduct an independent review or perform any forensic analysis. Based on this information, Herring made a normalizing adjustment of $148,252 to the 2018 operating expenses. Plainly speaking, Herring "added back" $148,252 to account for personal expenses erroneously categorized as business expenses.[FN] He applied discounts for lack of control (20%) and lack of marketability (22.5%). Based on these, and other, calculations, Herring valued Holton's interest at $1,645,544 ("Herring Appraisal").

> [FN] Herring's use of historical financial data was limited to 2018.

During his testimony, Herring conceded that Schomp's review of business expenses was limited to the first three quarters of 2018 and the figure of $148,252.30 almost certainly underreported the actual amount of personal expenses deducted from QL profits. Herring freely admitted that he "missed that in my analysis." During his testimony, Herring estimated personal expenses for the last quarter of 2018 and amended his estimate of fair market value to $1,689,803.

Herring also modified his valuation by normalizing Schomp's salary to reflect that Schomp worked 50% of the time. Making this adjustment amended his valuation to $1,760.619.

Normalizing both the 2018 expenses and Schomp's salary yields an amended value of $1,804,878.

Regarding the Cranfill appraisal, the circuit court's summary was as follows:

Holton retained Calvin D. Cranfill to perform an independent assessment of the value of Holton's units. Cranfill is a CPA, a member of the AICPA, and has extensive experience in business valuation. Like Herring, Cranfill used a discounted future net cash flow method.

Unlike Herring, Cranfill normalized expenses for travel, entertainment and meals to a flat $50,000, resulting in normalization of 2018 expenses of $417,341 instead of Herring's $148,252. As Defendants point out, the amount of $50,000 is significantly less than Holton's estimate of $180,000 for legitimate client development expenses.

Cranfill also normalized QL's 2019 expenses related to travel, entertainment and meals (an adjustment of $900,757), personal automobiles (an adjustment of $50,000) and professional fees (an adjustment of $167,641). The total adjustment for 2019 expenses was $1,118,398.

Cranfill applied a discount for lack of control (30% to Herring's 20%) and lack of marketability (10% to Herring's 22.5%). Based on these calculations, Cranfill issued a written report on February 6, 2020 valuing Holton's interest at $7,370,000.

Defendant pointed to two errors in Cranfill's report, including a claimed 42% increase in growth for 2018-2019 (Defendants assert this figure is actually 8.76% and therefore discredits the assumed future growth

-21-

rates) and the use of a low-risk rate of 1.5 (Defendants assert this should be 3.5).

At trial, Cranfill amended his valuation to $6,400,000, although the Court does not believe the amended figure takes into account the allegedly incorrect low-risk rate.

Cranfill testified that if his normalized expenses are substituted into Herring's report, using Herring's discounts, then Holton's interest has a value of $2,552,944. However, as Herring pointed out, Cranfill's example is not based upon 2018 expense figures. Rather, it is keyed off Cranfill's significant normalization adjustments for 2019 expenses. Applied over 2019-2023, this results in a normalization adjustment of approximately $1,000,000 each year.

Herring testified that the most significant differences between his valuation and Cranfill's valuation were the treatment of revenue growth, cash flow growth, and discounts. Cranfill was more aggressive in estimating growth. Herring applied more significant discounts. Herring does not believe their differences in the normalization of expenses for 2018 was as significant a factor.

(Internal citations to evidentiary record omitted.)

As indicated, the circuit court ultimately determined that Herring's appraisal of QL's fair market value, and his consequent valuation of Holton's ownership units, comported with the obligations of good faith and fair dealing. Holton asserts the circuit court erred in doing so. He points out various errors, most of which concern in one way or another the failure to properly account for all the personal expenses charged to QL. He contends that Cranfill's valuation is

-22-

more accurate because he attempted to take into account personal expenses besides those specifically identified by Schomp. Because Herring did not also do so, Holton maintains that the circuit court should not have afforded his appraisal any deference.

As already discussed, Herring's appraisal was entitled to a presumptive level of deference pursuant to the OA. The circuit court could not disregard Herring's appraisal without some determination that it was in bad faith (or the product of wrongdoing), as was the case with the King appraisal. The circuit court explained:

> [T]he plain language of the OA does not contemplate *de novo* judicial review of the fair market valuation of the company. Accordingly, the Court will not second-guess the good faith judgment of the appraisers.
>
> The purpose of the bench trial is to determine whether the King and Herring appraisals are the result of contractual wrongdoing or represent a genuine impartial judgment as to fair market value.
>
> Implied in the OA is a duty of good faith and fair dealing. Courts have established a variety of considerations relevant to the question of whether Defendants breached their duty of good faith and fair dealing, including the following:
>
> - Whether the "appraiser's determination was the product of a good faith, independent judgment." *PECO Logistics, LLC v. Walnut Inv. Partners, L.P.*, 2015 WL 9488249 at *11 (Del. Ch. December 30, 2015). Included in this review is a consideration of whether "one of the parties to the

-23-

contract takes action to taint the appraisal process – for example, by providing the appraiser with false financial statements . . ." *Id.*

- Whether the appraisal is "unworthy of respect because it does not, as a result of contractual wrongdoing, represent the genuine impartial judgment on value that the contract contemplates." *Id.*

- Whether the appraiser "utilize[d] accepted professional norms . . ." *Leach v. Princeton Surgiplex, LLC*, 2013 WL 2436045 at *2 (N.J. Super. Ct. App. Div. June 6, 2013).

- Whether the appraiser considered "less than all relevant evidence" or made a "mathematical error." *Id.* at *2.

- Whether the manager "[took] action that would result in an unreasonably low figure." *Leone v. Owsley*, 810 F.3d 1149, 1155 (10th Cir. 2015).

Accepting Herring's appraisal under this standard, the circuit court initially noted Holton's concession that Herring had used a proper methodology – the "discounted future net cash flow method" – in conducting his appraisal. Further, in relevant part, it explained:

> [A] business valuation is not a mathematical equation for which there is only one right answer. Both Cranfill and Herring are experienced CPAs with plausible explanations for their opinions. Because the Court is not conducting a *de novo* review, it will not quibble with Herring's value judgments, such as those related to the

-24-

SWOT[8] analysis or the particular discount percentages appropriate for this valuation.

Moreover, Herring's decision not to deduct from net profits those expenses related to personal use automobiles was not bad faith and does not render his report unreliable. Although expenses related to personal use automobiles might have been treated improperly on the tax returns, the expenses are arguably part of employee compensation packages and, therefore, proper business expenses.

The primary issue relates to Herring's acceptance of Schomp's assessment, without forensic review, of the 2018 business expenses for travel, entertainment and meals. Certainly, Herring's first attempt at valuation in his written report did not consider all relevant information because it included business expenses for the last quarter of 2018 that were personal in nature. However, Herring admitted this error and adjusted his valuation. Further, he admitted that certain adjustments might be appropriate to account for Schomp's reduced work schedule. With both of those adjustments, Herring testified Holton's membership interest is valued at $1,804,878.

There remains an issue regarding whether the balance of $319,088.70 reflects legitimate travel, meals and entertainment expenses for 2018 or whether this constitutes false financial data such that Herring's appraisal is tainted. The Court does not view the question as whether Schomp's analysis was perfect. Rather, the Court views the question as whether

---

[8] Herring testified that as part of his process of appraising QL, he relied on his "general knowledge of businesses" and "interviews with management" to conduct an analysis of QL's business-related *strengths*, *weaknesses*, *opportunities*, and *threats* (*e.g.*, a "SWOT" analysis). He further testified that, while it is reasonable to conduct such an analysis in this context, not every appraiser does so as part of a valuation report.

Schomp's review was reasonable and in good faith such that the data provided to Herring was reliable.

As to this issue, Schomp testified that having a successful logistics business requires a certain amount of client development and travel. Holton does not refute this basic proposition. According to Defendants and Cranfill, Holton admitted that amounts up to $180,000 would be reasonable for such expenditures on an annual basis. In addition, the record is clear that QL used meals as incentives for its employees and was free with such expenses.

As it concerns his review for purposes of the Herring Appraisal, there is no affirmative evidence that Schomp intentionally failed to designate expenses that were personal in nature. Holton has raised questions, but has not, with any certainty, pointed to any specific charge that Schomp failed to categorize as personal in nature. Of course, QL's total lack of documentation regarding these expenditures makes this inquiry difficult for both parties. As an owner of the business, Holton acquiesced in the practice of spending without accountability and is therefore partly accountable for the lack of documentation.

The bottom line is that, while Schomp's review may not have been perfect, there is insufficient evidence to suggest that it was so lacking in good faith as to make the financial data provided to Herring unreliable. Accordingly, the Court concludes Herring's valuation of $1,804,878 is reliable.

(Internal citations to evidentiary record omitted.)

We find no error and have no need to add to the circuit court's sound analysis. The circuit court's disposition in this respect was consistent with the

language of the parties' agreement, the evidence of record, and the circuit court's limited role of review in this matter.

Having considered the substance of Holton's arguments in cross-appeal No. 2021-CA-0557, we are unable to conclude that the circuit court abused its discretion or misapplied the law. While Holton quibbled with Herring's methodology and the expenses identified by Schomp, he failed to convince the circuit court that Herring's appraisal was the product of wrongdoing. Whether the second appraisal was the product of wrongdoing was a factual question for the circuit court. The evidence supports the circuit court's conclusion and certainly does not compel a contrary result.

## IV. APPEAL NO. 2021-CA-0511

We now turn to the direct appeal. While Schomp does not contest the circuit court's valuation, he does take issue with the circuit court's decision to award Holton pre- and post-judgment interest. The judgment provides, in relevant part:

> 2. The amount due from the Defendants [$1,804,878]
> shall bear interest at the rate of 8% compounded annually
> from January 1, 2019 until paid.
>
> 3. The full sum owed for the purchase of Holton's Units
> with accrued interest as of April 10, 2021 is $2,150,889.
>
> 4. The interest shall continue to accrue at $461.42 per
> day until paid or a Final Judgment is entered.

-27-

5. Upon the entry of a Final Judgment, the sums then due to Holton shall accrue interest at 6% per annum, compounded annually.

Schomp argues the circuit court abused its discretion in awarding any interest on the judgment because Section 8.e. of the OA stated that the ownership units would be paid for in "equal installments" and "quarterly without interest." We begin our analysis of this argument with the language of Section 8.e., which provides, in relevant part, as follows:

> A Member or the Company wishing to exercise its right to purchase or require the purchase under this provision shall give notice in writing to the Company and the other Members. The purchase price shall be the fair market value of the interest as determined by the procedure set forth in Section 8.d., without reference to insurance. **The purchase price shall be paid, and the interest transferred, within sixty (60) days of the notice. <u>At the option of the purchaser, the purchase price may be paid by tendering 25% of the purchase price to the selling Member, at which tiem [sic] the Member's interest shall be deemed transferred, with a promissory note for payment of the balance of the purchase price over a three-year period, with equal installments to be paid quarterly without interest</u>**.

(Bold emphasis added.)

As Section 8.e. makes clear, QL's liability for paying Holton the "purchase price" of his ownership interest became an *outstanding* liability sixty days after November 2, 2018, the date QL provided him "notice in writing" of its intent to "require the purchase." *Id*. The installment payment "option" was merely

-28-

an alternative to paying the *entire* purchase price within sixty days after QL

provided written notice; it did not modify the "within sixty (60) days" language.

Accordingly, invoking the installment payment "option" required QL to *tender*

"25% of the purchase price" to Holton – along with a note for the remaining

balance – *within* sixty days after providing written notice of its intent to require the

purchase of his ownership units.

With that said, the dispositive phrase is "purchase price," which

Section 8.e. defines as "the fair market value of the interest as determined by the

procedure set forth in Section 8.d., without reference to insurance." As the circuit

court correctly and exhaustively explained, Section 8.e. cannot be divorced from

the OA's implied covenant of good faith and fair dealing. Accordingly, that

provision implicitly gave Holton the right to contest whether QL's "tender,"

pursuant to any purported exercise of this "option," was indeed a good faith

representation of the fair market value of his ownership units (*e.g.*, the "purchase

price"). If it was *not* a good faith representation of the fair market value of his

ownership units, it follows that QL did *not* provide Holton the benefit of the

parties' bargain, and consequently did *not* invoke the installment payment option.

The circuit court did not memorialize in any written order why it

determined Holton was entitled to pre- and post-judgment interest, or why Holton

was entitled to it in the manner described in the April 14, 2021 judgment; nor did

the parties ask it to do so. But the crux of the circuit court's reasoning, as it explained from the bench during the April 9, 2021 hearing on this issue, was that QL could not be deemed under the circumstances of this case to have effectively invoked the installment payment option:

> I did go back and look at the operating agreement. And, you know, they did bargain for 25% of fair market value within sixty days with a promissory note for the balance payable over three years without interest. That's what they bargained for. But that's not what Holton got. He didn't get 25% of the fair market value because the court found that Schomp violated, or breached, this duty of good faith and fair dealing. He didn't get installments over three years. So, it just seems to me that it's inequitable to try to hold him to that provision of the contract that he bargained for three years without interest when in fact he didn't get the benefit of that bargain . . . .

Upon review, we agree with the circuit court's conclusion. Here, all that QL "tendered" to Holton within sixty days of providing him "notice in writing" of its intent to "require the purchase" of his shares was 25% of the King appraisal's valuation of his shares, plus a promissory note for the remaining 75% of that valuation. Below, the circuit court determined that King's appraisal, and QL's reliance upon it to ascertain the fair market value of Holton's ownership units, breached the OA's implied covenant of good faith and fair dealing. In rejecting King's appraisal on this basis the circuit court pointed out that King was not a certified business evaluator and that his final appraisal was based, in part, on false information relayed from Schomp. The circuit court further noted that King

-30-

did not conduct his valuation using recognized methods relying instead on his own research and experience, which he was unable to articulate. As explained by the circuit court:

> When the proper methodology is applied to financial data normalized for QL's use of revenue to pay personal expenses, the valuation increases from $884,559 (King's Appraisal) to at least $1,645,544 (Herring's Appraisal), an amount nearly ***double*** King's Appraisal.
>
> Accordingly, the Court concludes King's Appraisal is unworthy of respect because it does not, as a result of contractual wrongdoing, represent the genuine impartial judgment on value that the Operating Agreement contemplates.

Despite having conceded below that King's appraisal was not procured in good faith, Schomp argues on appeal that, as related to the award of interest, the circuit court incorrectly determined that he breached the OA's implied covenant of good faith and fair dealing by attempting to require Holton, pursuant to Sections 8.d. and 8.e., to sell his ownership units at a price based upon what the King appraisal represented was his units' "fair market value."

Schomp's argument in this vein is mutually exclusive. Schomp conceded that the circuit court correctly determined that the fair market value of Holton's ownership units in QL was $1,804,878 – not King's appraised value of $884,559. The basis of the circuit court's determination in that regard was that Herring's appraisal comported with the implied covenant of good faith and fair

dealing, whereas King's appraisal did not. Thus, Schomp effectively waived any argument concerning the validity of King's assessment. Alternatively, even if one could parse and appeal the circuit court's determination in this manner, the circuit court's determination would only be subject to review for clear error. CR 52.01. The circuit court's assessment of the evidence is consistent with the record, and we find no error under that standard.

Schomp also argues Holton should be "estopped" – *insofar as it relates to any award of pre- and post-judgment interest* – from contending that it breached the implied covenant of good faith and fair dealing because Holton also used company credit cards for personal use. This argument fails because it was not the fact of the personal expenses that breached the OA's covenant of good faith and fair dealing. Rather, it was the fact that Schomp knowingly procured a valuation based, in part, on those expenses the effect of which was a devaluation of QL. As the circuit court explained in its April 1, 2021 findings of fact and conclusions of law, "Simply because Holton acquiesced and participated in this behavior does not make personal expenses properly deductible from net profits for the purpose of arriving at a fair market value of QL."

In short, what QL "tendered" to Holton "within sixty (60) days" of its notice was *not* a good faith representation of the fair market value of Holton's ownership units (*e.g.*, the "purchase price"). It follows that the circuit court's

assessment was correct:  QL did *not* invoke the installment payment "option" of Section 8.e., and accordingly had no right to pay the value of Holton's shares in "equal installments" and "quarterly without interest."

To be clear, this result does not punish Schomp for failing to perfectly appraise Holton's shares within a sixty-day period; nor does it apply an unfair degree of hindsight to QL's valuation.  Rather, it is mandated because QL did not provide Holton the benefit of their bargain – a point the circuit court emphasized.  Any unfairness Schomp perceives in this result is tempered by the highly deferential standard of review he was accorded throughout these proceedings – "good faith and fair dealing" in this matter was a relatively low bar.  Furthermore, it is also tempered by the fact that QL received the benefit of its bargain with Holton on November 28, 2018, when it undisputedly received Holton's ownership interest.[9]  As of the date of this Opinion, Holton has received no payment from QL

---

[9]  Below, Holton argued that QL's attempted tender of 25% of a flawed appraisal was insufficient to trigger a termination of his interest in the company, and that he remained an owner of 30.77% of QL.  The circuit court disagreed.  In sum, the circuit court considered the language of Section 8.e., that "The purchase price shall be paid, and the interest transferred, within sixty (60) days of the notice."  It also considered these seemingly inflexible deadlines in conjunction with the process it recognized was nevertheless available for Holton to challenge QL's valuation – a process it recognized could last well beyond sixty days.  It held that giving effect to all of these considerations meant further recognizing at least two propositions:  (1) whether QL actually paid Holton fair market value for his ownership units was a subject that could be resolved in a process that could last well beyond sixty days; and (2) the resolution of that "process" had no bearing upon when Holton's ownership interest was effectively deemed transferred.  It accordingly determined Holton was divested of his ownership interest in QL as of November 28, 2018.  The circuit court's determination in that regard is not an issue on appeal.

whatsoever.[10]

We are left, then, with what Section 8.e. provided in the event QL did not exercise the installment payment option: "The purchase price shall be paid, and the interest transferred, within sixty (60) days of the notice." In other words, the OA provided that regardless of what the fair market value of Holton's ownership units was or how long it took to determine, the fair market value of Holton's ownership units would be considered an outstanding obligation sixty days after the notice. And in that event, Section 8.e. was *silent* regarding interest.

Regarding the issue of post-judgment interest, QL's sole argument with respect to why the circuit court erred in applying the 6% rate expressed in KRS[11] 360.040 is that subsection (3) of that statute precluded it. It provides:

> A judgment rendered on a contract, promissory note, or other written obligation shall bear interest at the interest rate established in that contract, promissory note, or other written obligation.

As discussed previously, however, the OA "established" no rate of interest and was otherwise silent regarding that issue under the circumstances.

---

[10] In his brief, Schomp complains it is *Holton*'s fault that he has received nothing to date because Holton "rejected the initial 25% payment of the King valuation. And, as Holton has made clear, even if Appellants had tendered 25% of the value determined by Herring, he still would not have accepted it based on Cranfill's overinflated pre-litigation valuations." Schomp's complaint is disingenuous at best. Had Holton *accepted* QL's tender of "the initial 25% payment of the King valuation," Schomp would have undoubtedly cited his acceptance as an accord and satisfaction. Nothing precluded Schomp from *unconditionally* tendering to Holton the *minimum* of what he agreed was owed to Holton, or from otherwise escrowing that amount.

[11] Kentucky Revised Statute.

Accordingly, the circuit court lacked authority under KRS 360.040(3) to specify a post-judgment interest rate other than 6%, and Schomp's argument has no merit. For parity of reasoning, *see Service Financial Company v. Ware*, 473 S.W.3d 98, 106 (Ky. App. 2015) (reasoning, under prior version of KRS 360.040, that a judgment for liquidated damages based upon a contract specifying no rate of interest could not deviate from the statutory post-judgment interest rate, which was then 12%); *see also Doyle v. Doyle*, 549 S.W.3d 450, 456 (Ky. 2018) ("All judgments bear interest. The amount of interest is mandated at the statutory rate unless the claim is unliquidated or interest is provided for in a separate written obligation.").

Regarding the issue of pre-judgment interest, the same analysis applies to the *rate* specified by the circuit court: "Absent a contractually agreed upon rate, the appropriate rate of interest is governed by statute. KRS 360.010 (setting the legal rate of interest in general) provides that the 'legal rate of interest is eight (8%) percent per annum.'" *Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d 856, 857 (Ky. App. 2003) (internal footnote omitted).

As to whether pre-judgment interest was warranted, the circuit court made no determination in any written order of whether Holton's damages were liquidated or unliquidated; it was never pressed by the parties to make such a determination; but for our purposes, it makes no difference. In the context of

liquidated damages, "prejudgment interest follows as a matter of course." *Nucor Corp. v. General Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991).

In the context of unliquidated damages, prejudgment interest may be awarded if doing so is consistent with justice and equity. *Id*. at 143. Here, that standard is met, because awarding Holton pre-judgment interest as of January 1, 2019, was consistent with giving him the benefit of his bargain with QL. "[J]ustice and equity demand an allowance of interest to the injured party. Where under a contract a debt is due at a certain time, both reason and authority say that it carries interest from that time." *Friction Materials Co., Inc. v. Stinson*, 833 S.W.2d 388, 392 (Ky. App. 1992) (citations omitted). As previously stated, the OA contemplated that regardless of what the fair market value of Holton's ownership units was determined to be, or how long it might take to make that determination, the fair market value of Holton's ownership units would be considered an outstanding obligation sixty days after November 2, 2018, when QL provided written notice of its intent to require the purchase of his ownership units. January 1, 2019 – the date that the circuit court specified prejudgment interest began to accrue – was sixty days after November 2, 2018.

## V. CONCLUSION

For the reasons set forth above, we affirm the Fayette Circuit Court's judgment.

ALL CONCUR.


BRIEFS FOR APPELLANTS/CROSS-APPELLEES:

Brian M. Johnson
Logan J. Mayfield
Lexington, Kentucky

BRIEFS FOR APPELLEE/CROSS-APPELLANT:

Thomas W. Miller
Lexington, Kentucky